UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**
FEB - 5 1999
**NANCY DOHERTY, CLERK**
By _____
Deputy

HENRY W. SKINNER,
    Petitioner,

      vs.

GARY JOHNSON, DIRECTOR TDCJ-ID,
    Respondent.

No. 2 - 99 C V - 0 4 5 - J

PETITION FOR WRIT OF HABEAS CORPUS
BY PERSON IN STATE CUSTODY

STEVEN C. LOSCH
Attorney for Petitioner
906 Delia Drive
Longview, Tx. 75601
903-234-1373

DOUGLAS ROBINSON
c/o Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
202-371-7800

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

---

HENRY W. SKINNER,
Petitioner,

vs.                          No. _____

GARY JOHNSON, DIRECTOR TDCJ-ID,
Respondent.

---

## PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

To the Honorable Mary Lou Robinson, Judge of the United States District Court for the Northern District of Texas, Amarillo Division:

Petitioner HENRY W. SKINNER, an inmate confined on death row at the Ellis I Unit of the Texas Department of Corrections in Huntsville, Texas, petitions this Court for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254(d)(1), staying his execution and ordering that his conviction for capital murder and sentence of death by lethal injection be vacated and releasing him from custody unless he is retried within a reasonable period of time.

### INTRODUCTION

This case demonstrates how "our system of justice suffers when an accused is treated unfairly" by law enforcement officials who believe that they are above the law. Ex parte Brandley, 781 S.W.2d 886, 894 (Tex. Crim. App. 1089). A sheriff who harbored a pathological hatred for Mr.

2

Skinner maneuvered the investigation of this capital murder so that Mr. Skinner became the sole suspect even before a shred of evidence was collected. No investigation whatsoever was made of another person who, far more than Mr. Skinner, possessed the means, motive and opportunity to commit the crime. Scientific tests that likely would have determined conclusively who committed the murders were never performed. When witnesses' testimony did not fit the state's case, the testimony was distorted by threats and manipulation, and key exculpatory evidence was withheld from the defense.

The effects of the state's misconduct were exacerbated by the ineffectiveness of Mr. Skinner's own, court-appointed counsel. His lead counsel, Harold Comer, was a close political supporter of the trial judge and was himself the former elected district attorney for Gray County who had been run out of office for embezzlement of public funds and cocaine addiction. As district attorney, Comer prosecuted Mr. Skinner for two of the felonies that were used against Mr. Skinner at the sentencing phase of his trial. There is nothing in the record to show that Mr. Skinner was told by Comer or the trial judge of the deleterious effect this conflict would have on his case or that he had a right to a different lawyer. Throughout the trial, counsel failed to present evidence or conduct cross-examination that would have exposed the weaknesses in the state's case. Yet, by the time the trial ended, the court had awarded Comer one of the largest fees ever collected by a court-appointed lawyer in Texas – enough to help Comer pay off some of his obligations to the Internal Revenue Service for filing false tax returns.

The miscarriage of justice did not end there. When Mr. Skinner's state habeas counsel filed a routine motion for extension of time to file a habeas petition, the same judge who had tried the case sat on the motion until he could see what was in the petition. After a petition was filed that exposed

3

the abuses that occurred at Mr. Skinner's trial, the trial judge denied the motion for an extension of time and dismissed the petition on the ground that it was filed out of time. This completely arbitrary result perfectly served the judge's then-current political needs, since he was engaged in a hotly contested re-election bid (which he eventually lost) and was under attack by his opponent for spending too much of the taxpayers' money on the Skinner trial. A bitterly divided Texas Court of Criminal Appeals affirmed the trial court's dismissal of the petition without examining the merits of any of the issues raised by Mr. Skinner.

Mr. Skinner therefore must turn to this honorable Court for the realization of his constitutional right to a fair trial.

<u>PROCEDURAL HISTORY</u>

Applicant Henry Watkins Skinner was indicted for capital murder in 31st Judicial District Court of Gray County on January 31, 1994.

The venue was changed to District Criminal Court No. 3 of Tarrant County. The district judge for the 31st Judicial District Court of Gray County, Kent Sims, presided over the trial.

On March 23, 1995, Mr. Skinner was sentenced to death by lethal injection after a jury found that he was guilty of capital murder and answered the first special issue, regarding the probability of Mr. Skinner's future dangerousness, "yes," and the second special issue, regarding the existence of countervailing mitigating evidence, "no". <u>See</u> Art. 37.071 V.A.C.C.P.

Venue was returned to the 31st Judicial District Court of Gray County on April 20, 1995. Mr. Skinner's motion for a new trial was overruled by that court and the judgment was filed there.

Mr. Skinner's conviction and death sentence were affirmed on direct appeal on May 21, 1997. <u>Skinner v. State</u>, 956 S.W.2d 532 (Tex. Cr. App. 1997) (opinion attached in Exhibit 40). Judges

Womack and Overstreet dissented without an opinion. Mr. Skinner's motion for rehearing was denied on September 10, 1997. Judges Baird and Overstreet dissented without an opinion. Mr. Skinner's petition for a writ of certiorari on direct appeal was denied by the United States Supreme Court on April 20, 1998. Skinner v. Texas, 118 S. Ct. 1526 (1998).

On July 25, 1997, Mr. Skinner's appellate counsel was appointed by the Texas Court of Criminal Appeals to prepare an application for a writ of habeas corpus for him within 180 days.

On January 19, 1998, Mr. Skinner filed a motion in the Texas Court of Criminal Appeals for a 90 day extension of the non-jurisdictional January 21, 1998 deadline for filing his application for a writ of habeas corpus. He was prepared to file a skeletal application for the writ that would have preserved some of his claims if that motion was denied.

On January 21, 1998, at about 3:00 p.m., the Court of Criminal Appeals denied Mr. Skinner's motion for a 90-day extension of the minimum filing deadline without prejudice and instructed him to refile it in the trial court. Mr. Skinner's attorney in Longview tried to refile the motion by faxing it to the trial court in Pampa that day, but he was unable to do so. He refiled the motion via private overnight courier on the following day, January 22, 1998. No opposition to the motion was filed by the State.

The trial court still had not ruled on the motion for extension by the time Mr. Skinner filed his application for a state writ of habeas corpus on March 26, 1998, 68 days after the original filing deadline and well within the 90 day extension that was requested.

On April 3, 1998, the trial court ruled that Mr. Skinner's application for the writ was untimely without ruling on his motion for an extension. On April 22, 1998, the Texas Court of Criminal Appeals remanded Mr. Skinner's habeas case to the trial court to determine whether he had good

cause for filing his application for the writ after the original deadline. In doing so, the court noted

a statutory provision that requires the court to conduct a "good cause" hearing 11 days after the filing

date for a habeas petition in a death case if no petition has been filed by that date. Art. 11.071(4)(c)

V.A.C.C.P.

Judge Sims conducted the good cause hearing on May 6, 1998. Judge Sims believed all of

the evidence that Mr. Skinner presented, but found that his attorney's obligations to other clients in

seven capital cases and the unexpected illness and resignation of his private investigator did not

establish good cause as a matter of law even if these problems were unforeseeable and unavoidable.

On December 2, 1998, the Texas Court of Criminal Appeals, relying on the findings of the

trial court, agreed by a 7-2 vote that Mr. Skinner did not establish good cause for filing his

application for the writ after the original deadline without indicating what good cause means. Ex

parte Skinner, Writ No. 20,203-03 unpublished order (Tex. Cr. App. Dec. 2, 1998) (order attached

as Exhibit 41). The court made no effort to establish criteria as to what "good cause" means in this

context. Judges Baird and Overstreet stated in their dissenting opinion:

> The amicus brief file on behalf of the Texas Criminal Defense Lawyers Association
> best outlines the reason for this untimely application. "This Court has read enough
> briefs in capital cases and ruled on a sufficient number of motions for extensions in
> capital cases to understand what it means for a solo practitioner to file over 400 pages
> of briefs and petitions in seven capital cases and start preparing for a capital trial in
> 45 days, as he did. The fact that his private investigator resigned at a crucial stage,
> his concern about unfairly damaging another lawyer's career and the procedural
> puzzle that he had to solve on the last day of the minimum filing period made this
> showing of good cause overwhelming. "Thus, it appears to [us] that counsel should
> be lauded and not criticized for his efforts to see that" his client received a full and
> fair hearing on the merits of his claims." (citation omitted). . .The dismissal of this
> writ means a compelling legal argument on conflict of interest will not be subjected
> to any judicial review...Because of trial counsel [Harold Comer's] known drug
> addiction, there was a substantial investigation by the Attorney General's Office
> regarding missing funds from the district attorney's office. After leaving office,

6



> [Comer] was assessed a $90,000 bill from the I.R.S. A few months later, trial counsel [Comer] was appointed [by Judge Sims] to the instant case and ultimately paid almost $90,000. these facts demand a substantive evidentiary hearing before an impartial tribunal.

Ex parte Skinner, Writ No. 20,203-03 unpublished order at 3-5 (Baird and Overstreet, JJ., dissenting) (emphasis in original).

On January 27, 1998, the Texas Court of Criminal Appeals entered an unpublished order denying Mr. Skinner's application for a writ of habeas corpus because it was untimely. In the meantime, on January 18, 1999, counsel for Mr. Skinner was notified by Matthew C. Martindale, Assistant District Attorney, that an execution date for Mr. Skinner would be set by the 31st Judicial District Court of Gray County on February 5, 1999. According to Texas practice, the execution date will be 30 days later, or March 7, 1999.

<u>THE EVIDENCE AT THE GUILT STAGE OF MR. SKINNER'S TRIAL</u>

Mr. Skinner was convicted of murdering his girl friend, Twila Busby, and her sons, 22 year-old Elwin Caler and 20 year-old Randy Busby, at the home they shared on New Year's Eve, December 31, 1993.

Early that evening, Twila's ex-husband, Melvin Busby, came to the house to take Caler and Randy Busby out for dinner at a restaurant (Vol. 27 at 754).[1] According to Melvin Busby, he remained in the house for only five minutes (Vol. 27 at 755). Twila appeared to Marvin as if "she'd been drinking some," but she was not intoxicated (Vol. 27 at 757). Mr. Skinner appeared to be asleep on a couch in the living room, but Melvin did not try to converse with him (Vol. 27 at 755). Mr. Skinner still appeared to be sleeping on the couch when Melvin Busby brought Caler and Randy

---

[1]     The volume and page numbers of the Statement of Facts are cited in parentheses.

Busby home shortly after 8:00 p.m. (Vol. 27 at 756). Melvin Busby left the house almost immediately without trying to talk to him (Vol. 27 at 756).

Howard Mitchell, an acquaintance of Mr. Skinner and Twila, testified that they called him from their house at 9:30 p.m. and asked him to drive them to his place to have a New Year's Eve drink (Vol. 26 at 603). When Mitchell came to pick them up at about 10:15 to 10:30 p.m., however, Mr. Skinner appeared to Mitchell to be unconscious on the couch in the living room with a bottle of vodka near him on the floor (Vol. 26 at 507, 575-80, 605, 630-632; Vol. 27 at 770-71; Vol. 28 at 753-55). Mitchell tried to wake Mr. Skinner up by jerking his arm hard four times and shouting at him as loudly as he could, but Mr. Skinner remained completely unconscious. Mr. Skinner appeared to Mitchell to be in a mild coma (Vol. 26 at 606-08, 610). Mitchell waited 15 minutes for Mr. Skinner to get up, but he did not move a muscle (Vol. 26 at 611). Mitchell testified that he did not believe Mr. Skinner could have recovered from that condition in time to commit the murder between 11:15 p.m. and midnight (Vol. 26 at 608, 622).

Mitchell and Twila left Mr. Skinner alone at about 10:30 to 10:45 p.m. and took the bottle of vodka with them to a party at Mitchell's trailer house (Vol. 26 at 577, 611, 620). Twila's uncle, Robert Donnell, was at the party (Vol. 26 at 620; Vol. 29 at 1281). Donnell was a big ex-convict with a hot temper who had sexually molested a girl and grabbed a pregnant woman by the throat. He usually kept a knife in the trunk of his car (Vol. 26 at 615-18, 619; Vol. 29 at 1281, 1296, 1300-01).

Donnell became very drunk at the party (Vol. 26 at 619-20). Mitchell "sensed that [Donnell] would be a danger" because he had "a certain kind of hate" in his eyes (Vol. 26 at 618). He followed Twila around as if he was stalking her and made rude sexual advances (Vol. 26 at 619-20; Vol. 29

at 1277, 1281). Twila became agitated. Within a half hour of her arrival, she asked Mitchell to take her home (Vol. 29 at 1277, 1279).

Mitchell's daughter saw Twila drink some vodka at the party, but "she wasn't drunk" when she left (Vol. 29 at 1276). Mitchell noticed that Twila was "fidgety and worried" when he dropped her off in front of her house at about 11:00 to 11:15 p.m. (Vol. 26 at 579-80, 629-30). She got out of his car and walked to her front door without any assistance (Vol. 26 at 580, 629-30). When Mitchell returned home to his party, Robert Donnell was no longer there (Vol. 26 at 629; Vol. 29 at 1289).[2]

At midnight, Police Officer Fred Courtney was dispatched to investigate a stabbing in Mr. Skinner's neighborhood (Vol. 24 at 49-50, 63). Courtney found 6'6" tall, 225 pound Elwin Caler sitting on the porch of a neighbor's house wearing nothing but a pair of blood stained undershorts (Vol. 24 at 65; Vol. 28 at 1211-12). Caler appeared to be alive, but he had a mortal stab wound under his left arm (Vol. 25 at 303; Vol. 28 at 1192-93). He died at 12:45 a.m. without identifying his killer (Vol. 28 at 1193, 1208).[3]

Police officers Morse Burroughs and Katie Gerhardt and Lt. Allan Smith, searched the house where Caler lived with his mother, brother and Mr. Skinner (Vol. 26 at 635). Smith was concerned that the Pampa police did not have an adequate policy for investigating a major crime scene (Vol.

---

[2]      Mitchell told the district attorney's investigator that he believed that Donnell could have murdered Twila (Vol. 26 at 623).

[3]      Dr. Peacock testified that Caler was physically normal. Twila Busby's mother, Beverly Clark, claimed that Caler was mentally retarded and had muscular dystrophy, but she conceded on cross-examination that he exercised by running and was "a pretty good basketball player" (Vol. 26 at 710-11; Vol. 27 at 771, 777; Vol. 28 at 1212).

26 at 670-71). Sheriff Randy Stubblefield decided that Mr. Skinner was the prime suspect before the search began (Vol. 25 at 345).

The officers found a bloody knife on the front porch of the house (Vol. 24 at 94-97, 104-05, 110-11). Twila Busby's dead body was on the living room floor (Vol. 24 at 117, 142). Her pants were unzipped and her blouse was raised (Vol. 25 at 309). A blood stained ax handle was leaning against the couch near her corpse (Vol. 24 at 163; Vol. 25 at 397, 415, 418). There was another knife and a towel with wet brown stains on it in a black plastic trash bag next to the couch (Vol. 25 at 414-16, 418; Vol. 27 at 798).

An autopsy disclosed that Twila Busby was manually strangled until her neck broke and hit in the head 14 times with a club (Vol. 28 at 1186-87, 1189 1209). The blows fractured her unusually thick skull (Vol. 28 at 1171, 1183, 1186). She sustained defensive wounds on her arms (Vol. 28 at 1187). She had blood under her fingernails, human hairs in the palms of her hands and a human hair caught under a ring that she was wearing (Vol. 25 at 434, 439; Vol. 28 at 1037, 1216).

Police Officer Jess Wallace concluded from his analysis of the blood spatters on the walls in the living room that Twila Busby was clubbed to death a few feet away from the couch that Mr. Skinner was laying on when she left the house with Mitchell (Vol. 27 at 822-25). Burroughs concluded from his analysis of the blood spatters on Caler's undershorts that he was in Twila's immediate vicinity when she was murdered near that couch (Vol. 26 at 216).

When Burroughs entered the bedroom where Caler and Randy Busby slept in bunk beds, he found Randy's dead body laying face down on the upper bunk under a blood spotted blanket (Vol. 24 at 119-20). Randy had three stab wounds in his back. There was no blood in the empty lower bunk bed where Caler slept (Vol. 28 at 1197-98).

Mr. Skinner's bloody hand prints were found about 18 inches above the floor on the frame of the door to the boys' bedroom and on the knobs of two other doors in the house. He could have made all of the hand prints if he fell down as he was moving in a drunken stupor from the living room to the back yard (Vol. 24 at 135, 183-84; Vol. 26 at 702; Vol. 27 at 791-92, 796, 911-16, 951-52).

When the police were searching the crime scene, Mr. Skinner was with Andrea Reed in her trailer, four blocks away from his house. According to Ms. Reed's testimony at trial,[4] Mr. Skinner knocked on Reed's door shortly after midnight (Vol. 26 at 488; Vol. 30 at 1483). When Reed opened the door, she saw a group of Mexicans across the street celebrating the New Year by firing shotguns into the air (Vol. 26 at 488). Reed warned Mr. Skinner that she would call the police if he did not leave, but he entered her house and said "they're out to get me, they're shooting at me" (Vol. 26 at 490-91, 518).

Mr. Skinner told Reed that she had to help him because he had been stabbed and shot (Vol. 26 at 491). Mr. Skinner was obviously intoxicated. Reed noticed that he was not wearing shoes and there was blood on his shirt and pants (Vol. 26 at 492-93). Mr. Skinner removed the shirt and asked Reed to examine his wounds (Vol. 26 at 519). Reed did not see any injuries on his body, but he had a profusely bleeding cut in the palm of his right hand. Reed agreed to treat the wound. The State's pathologist, Dr. Elizabeth Peacock, believed that the cut could have been a defensive wound or an injury that Mr. Skinner accidentally inflicted when he stabbed someone else (Vol. 26 at 492-94, 520; Vol. 28 at 1202-03, 1214).

---

[4]     As will be explained below, Ms. Reed has subsequently admitted that some of her trial testimony was false or misleading.

11

Mr. Skinner conversed with Reed for almost three hours. He made a series of inconsistent statements about the source of his injury and events in the past that never happened. He repeatedly promised to tell Reed the truth, but he kept changing his story (Vol. 26 at 488, 500, 522; Vol. 27 at 790). At times, it appeared to Reed that he did not know who he was talking to or where he was (Vol. 26 at 452). According to Reed's trial testimony, she tried to call the police, but Mr. Skinner threatened to kill her if she used the telephone (Vol. 26 at 496-98). Also according to her trial testimony, Mr. Skinner finally told Reed that he would explain what really happened to him if she swore not to reveal it to anyone (Vol. 26 at 501). Reed promised not to tell (Vol. 26 at 501). Mr. Skinner said that he thought that he kicked Twila to death (Vol. 26 at 500-01).

Sheriff Stubblefield, his deputy James Walker, McMinn, Gerhardt and Smith arrested Mr. Skinner in Reed's trailer house at about 3:00 a.m. When Mr. Skinner heard their car pull up, he told Reed, "it's the law" (Vol. 25 at 356-58; Vol. 26 at 502; Vol. 27 at 790). Reed's house "became full of police officers" (Vol. 26 at 504). Stubblefield, McMinn and Smith found Mr. Skinner standing in a closet (Vol. 25 at 358, 363). He appeared to be drunk (Vol. 25 at 204). Stubblefield handcuffed him, removed his blood stained socks from his feet and gave them to Gerhardt to preserve as evidence (Vol. 25 at 360).

Stubblefield escorted Mr. Skinner to a patrol car and told him that there were two outstanding warrants for his arrest. According to Stubblefield's testimony, Mr. Skinner asked Stubblefield, "is that all?" (Vol. 25 at 360-62, 365). Stubblefield informed him that Twila and her sons were murdered (Vol. 25 at 365). Mr. Skinner repeatedly said that he did not understand (Vol. 25 at 365).

12

A few hours later, when Mr. Skinner was in custody, a police officer said he saw him urinate on his blood stained pants and rub the wet area with his hand. The pants were taken from him and he was given another pair to wear (Vol. 26 at 641).

Mr. Skinner voluntarily gave the police a sample of his blood at 5:48 a.m. (Vol. 27 at 809-11, 944-45). Large quantities of alcohol and codeine were found in it (Vol. 27 at 945; Vol. 28 at 1071).

On January 4, 1994, Mr. Skinner voluntarily gave a statement to Stubblefield and McMinn (State's Ex. 59).[5] Mr. Skinner remembered little of what happened after he fell asleep on the couch (State's Ex. 59 at 3-4). He recalled that he was drinking vodka and took a drug called Xanex (State's Ex. 59 at 5). He thought that Twila may have gone to Mitchell's house (State's Ex. 59 at 4). He recalled that his bottle of vodka was missing when he woke up on the couch (State's Ex. 59 at 4). He was sure that he saw someone standing over him holding a knife before he ran out of the house (State's Ex. 59 at 2). He thought that Twila may have come home drunk and cut him with a knife, but he did not have a clear recollection of this (State's Ex. 59 at 11). He said that he loved Twila and her sons and could not imagine being angry enough to hurt them (State's Ex. 59 at 10).

Dr. Peacock and Detective Terry Young agreed that Caler and Randy Busby could have been stabbed with the knives that were found on the porch and in the black plastic bag near the couch (Vol. 25 at 423; Vol. 28 at 1213-14). No fingerprints were found on the knives, but there were fingerprints on the bag that were not made by Mr. Skinner (Vol. 27 at 915-16, 920-21). The Pampa police asked D.P.S. criminalist Gary Stallings to determine whether the stain on the towel in that bag

---

[5]    The State's trial exhibits are cited as (State's Ex.). Defense trial exhibits are cited as (Def. Ex.).

was human blood. Stallings did not perform that test or test the knife in the bag for blood (Vol. 27 at 992, 1008-10).

Dr. Peacock and Stallings agreed that the hairs that were found in Twila Busby's hands and under her ring could have come from her assailant (Vol. 28 at 1062, 1216). Young thought that it was very important to perform microscopic and DNA tests to determine whether those hairs matched samples of Mr. Skinner's hair and the hair of the victims that were preserved for comparison (Vol. 26 at 436; Vol. 28 at 1017, 1022, 1028). Stallings did not have the tests done because he assumed that the hairs in Twila's hands probably came from her head or the carpet (Vol. 26 at 437, 477; Vol. 28 at 1029, 1031, 1056).

Stallings believed that Twila Busby could have gotten her assailant's blood under her fingernails by scratching him. He did not have DNA tests performed on her bloody fingernail clippings and the known samples of her blood and Mr. Skinner's blood that were preserved to verify that hypotheses because he assumed that the blood under her nails was probably hers (Vol. 27 at 249; Vol. 28 at 1037).

Young believed that it was important to perform a DNA test on a rape kit that Dr. Peacock preserved to determine whether Twila Busby had sexual intercourse with someone other than Mr. Skinner. Stallings decided not to have the test done because he believed that Twila was not raped. He did not know that Twila's pants were unzipped and her blouse was raised above her stomach when he made that decision (Vol. 25 at 441, 443-44; Vol. 28 at 1038, 1046-47, 1060, 1062).

Mr. Skinner's expert in toxicology, Dr. William Lowry, testified that it was highly improbable that Mr. Skinner was physically able to murder Twila Busby and her sons because he was too intoxicated. Dr. Lowry calculated from the result of the toxicological test of the blood

14

sample that Mr. Skinner gave to the police at 5:48 a.m. that at the time of the capital murder his blood alcohol level was .21 percent and he had eight therapeutic doses of codeine in his system. Dr. Lowry told the jury that the two intoxicants had a synergistic effect that drastically increased their potency (Vol. 29 at 1344-45, 1354, 1356-58, 1361; Vol. 30 at 1463). In Dr. Lowry's opinion, Mr. Skinner did not have the physical coordination that was required to inflict all of the wounds that the three victims sustained because he was in a stuporous condition with impaired balance and a staggering gait (Vol. 29 at 1369, 1371, 1375, 1384, 1514).

In Dr. Lowry's opinion, Mr. Skinner's statement to Reed that he thought that he kicked Twila to death could have been based on a confabulated recollection of an imaginary event. Dr. Lowry believed that Mr. Skinner probably had no recollection of what really occurred after lapsed into a mild coma on the couch because an extremely high dose of codeine and alcohol destroyed the brain cells that carried his short term memory. Dr. Lowry explained that Mr. Skinner could have unconsciously filled in the blank by combining his recollection of real events with fantasized facts (Vol. 29 at 1381-1383).

Dr. Lowry testified that the bloody hand prints that Mr. Skinner left 18 inches above the floor on the door frame of the boys' bedroom were consistent with the theory that he was in a stuporous condition. He explained that Mr. Skinner could have fallen down near that door and grabbed the frame to lift himself up because his balance was severely impaired (Vol. 29 at 1384).

### CLAIMS FOR RELIEF

I.     MR. SKINNER WAS DENIED DUE PROCESS BECAUSE THE PROSECUTOR KNOWINGLY ELICITED TESTIMONY FROM ANDREA REED WHICH LEFT THE FALSE IMPRESSION THAT MR. SKINNER CONFESSED TO THE MURDER OF TWILA BUSBY.

II.     MR. SKINNER WAS DENIED DUE PROCESS BECAUSE
        A POLICE OFFICER AND THE DISTRICT ATTORNEY'S
        INVESTIGATOR CREATED FALSE EVIDENCE ABOUT
        HIS ABILITY TO FUNCTION UNDER THE INFLUENCE
        OF CODEINE AND ALCOHOL AT THE TIME OF THE
        CAPITAL MURDER BY THREATENING ANDREA
        REED.

III.    MR. SKINNER WAS DENIED DUE PROCESS BECAUSE
        THE PROSECUTOR DID NOT DISCLOSE THAT
        ANDREA REED WAS THREATENED BY HIS
        INVESTIGATOR AND A POLICE OFFICER.

### Statement of Facts

#### The Police Conducted a Biased Investigation and Ignored Evidence of Another Suspect's Guilt

The Sheriff of Gray County, Randy Stubblefield, was incapable of conducting a fair and impartial investigation of the capital murder of Twila Busby and her sons because he had a pathological hatred for Mr. Skinner that warped his judgment (Ex. 4).[6] Mr. Skinner was incarcerated in the jail that Stubblefield ran with an iron hand on several occasions before he was arrested for that offense. Mr. Skinner had more knowledge of his legal rights than any other prisoner that Stubblefield encountered because he worked for a local attorney, James "Rowdy" Bowers, as a private investigator and paralegal. His effective jailhouse lawyering about conditions in the jail, bail bonds and arrest warrants infuriated Stubblefield. One of the guards, Kathy Reed, has sworn in an affidavit that Stubblefield was obsessed with Mr. Skinner and violated his rights with impunity whenever he was incarcerated in the Gray County jail.  (Ex. 4).

---

[6]     The exhibits attached to this application for a writ of habeas corpus are cited as (Ex. __).

16

When two warrants for Mr. Skinner's arrest were issued in December of 1993, Stubblefield was determined to take him into custody and keep him behind bars during the holiday season. Stubblefield personally made four attempts to execute the warrants, but Mr. Skinner was still a free man on New Year's Eve when Stubblefield heard a report about the murder of Twila Busby and her sons on his police scanner (Ex. 4). Stubblefield assumed that Mr. Skinner was the killer and rushed to the scene of the crime to prove it (Ex. 5).

Stubblefield convinced the police officers who investigated the capital murder that Mr. Skinner was guilty before they collected any evidence or interviewed a witness (Ex. 6). Stubblefield tried to disguise the bias that he injected into the investigation by falsely stating in his first report that Police Officer Katie Gerhardt told him when he arrived at the crime scene that she had independently concluded that Mr. Skinner was a likely suspect (Ex. 5). However, Gerhardt declared in her first report that she learned from Stubblefield "that the suspect was Henry Watkins Skinner" (Ex. 6).

Howard Mitchell told the police that he believed that Robert Donnell killed Twila Busby after he left the party, but they did not investigate that lead because their entire focus at that point was to prove Mr. Skinner guilty (Ex. 30 at p. 20). When Officer Connie Brainard wrote a report about her interview of Mitchell, she even omitted Donnell's name from the list of people who were at the party that Mitchell gave to her (Ex. 31).

When Bill McMinn interviewed Mitchell, Mitchell told him that he believed that Donnell killed Twila Busby and disclosed that Donnell served time in prison for a murder (Ex. 30). McMinn

replied, "that's the kind of information we don't have." Mitchell told McMinn that he gave it to the police (Ex. 30 at 20). McMinn did not pursue the subject.[7]

District Attorney John Mann did not instruct McMinn to investigate Donnell's involvement in the capital murder because he believed that the DNA tests of the blood on Mr. Skinner's clothes eliminated Donnell as a suspect. Donnell was never questioned and no effort was made to ascertain his whereabouts at the time of the offense. The fingerprint that was not made by Mr. Skinner on a bag that contained a likely murder weapon was not compared to a set of Donnell's prints that the FBI had in a computer file. No one asked Donnell if he would be willing to submit samples of his blood, hair and semen that could have been compared to the blood under Twila Busby's fingernails, the human head hairs in her hands and the rape kit.[8]

The False Testimony that Was Created With Undisclosed Threats

Andrea Reed has admitted in a sworn affidavit that she gave false testimony at Mr. Skinner's trial because she was threatened by members of the prosecution team (Ex. 1). The truth, as set forth in her affidavit, is Reed was in bed with her daughter, Jessica, and son, Kris, around midnight on December 31, 1993, when she heard someone pounding on the wall of her trailer house. Reed asked the person knocking to identify himself. Mr. Skinner responded, "Andy, I'm hurt, please let me in." Reed once had a very friendly relationship with Mr. Skinner, but she did not want to associate with

---

[7]     Had he done so, he would also have learned from Mitchell that Donnell tried to rape Twila more than once (Ex. 7; Ex. 30).

[8]     As discussed above, Detective Terry Young wanted to have physical evidence that could have exonerated him tested, and Lt. Allan Smith was critical of the investigation, but their views were ignored.

him because he abused drugs and alcohol. She ordered him to leave and threatened to call the police if he did not do so.

Mr. Skinner told Reed that he was shot and pleaded with her to help him. Reed reluctantly got out of bed, turned on the porch light and opened her front door. Mr. Skinner was standing in front of her house with a lot of blood on him. Reed decided to invite Mr. Skinner inside to help him because she believed that he could be seriously injured and she felt sorry for him. Mr. Skinner was so intoxicated that he stumbled and fell over backwards when he tried to climb up a small flight of steps in front of Reed's house. Reed either caught him before he hit the ground or helped him get up. He had to lean on her arm to climb the steps and enter the house.

Reed helped Mr. Skinner remove his shirt and hung it over a chair. She discovered that he was not shot, but there was a deep slash in the palm of his hand that was bleeding profusely. She sat him down in her kitchen and treated his wound. She noticed that there was blood on his watch and washed it off. He tried to get up from his chair to use the toilet. His balance was so badly impaired that she had to help him walk from the kitchen to the bathroom. Reed believed that he was much too intoxicated to be physically capable of harming her.

Mr. Skinner gave Reed several unbelievable explanations of how his hand was injured. Each time that Mr. Skinner changed his story, he promised to give Reed the real explanation of what happened and made her swear not to repeat what he was about to say. In one of Mr. Skinner's stories, he came home from work and caught Twila Busby in bed with her ex-husband. Mr. Skinner said that he punched Twila's ex-husband, kicked him out of his house and thought that he kicked Twila to death. Mr. Skinner made Reed swear not to tell this story to anyone, just as he did before he told her all of the other tales. Reed knew that the story was false because Mr. Skinner gave her a grossly

inaccurate physical description of Twila's ex-husband. Mr. Skinner started to tell Reed another story about a man named Ricky Palmer when the police arrived at her house and arrested him.

Shortly after Mr. Skinner was taken to the jail, Reed heard Police Officer Katie Gerhardt tell one of her curious neighbors that he could not enter the house because it was "a triple homicide crime scene." Reed surmised that Mr. Skinner was suspected of murdering three people. She could not understand how her house could be a crime scene, unless the police believed that she was involved in the offense.

Reed's fear of being falsely accused escalated when Gerhardt and McMinn informed her that Mr. Skinner had an accomplice and asked her where that person was. Reed told them that she did not know what they were talking about. Gerhardt and McMinn kept asking her the same question and Reed gave them the same answer each time. Gerhardt finally warned Reed that she could be charged with being an accessory after the fact or harboring a fugitive if she did not cooperate. Reed was cooperating, but she knew that Gerhardt believed that she was hiding something.

Reed told her first lie when Gerhardt and McMinn asked her how Mr. Skinner entered her house. Reed was afraid to admit that she invited Mr. Skinner to come inside because she did not want to say anything that could be construed as evidence that she offered a wanted murderer a place to hide from the police. She falsely told Gerhardt and McMinn that Mr. Skinner entered the house without her consent and claimed that she did not know how he did it. Gerhardt informed Reed that she did not believe this clumsy lie. Gerhardt warned Reed that she could be charged with a crime if she invited Mr. Skinner into her house knowing that the police were trying to arrest him.

Police Officer Connie Ogle took a written statement from Reed that included a truthful description of what Mr. Skinner said to her and several lies to convince the police that she "didn't

protect him in any way" (Ex. 2). Reed falsely claimed again that Mr. Skinner entered her house without her consent. She falsely maintained that Mr. Skinner threatened to kill her if she called the police. She falsely stated that she believed that he was capable of carrying out that threat because of his intoxication. She also falsely asserted that Mr. Skinner removed his own shirt, washed the blood off of his watch and walked to the bathroom without any assistance.

After Reed signed her written statement, McMinn learned that Reed told Ogle that she did not want her young daughter, Jessica, to be a witness at Mr. Skinner's trial because it would be a traumatic experience for her. McMinn decided to use Reed's fear of involving the girl in the trial to ensure that she would continue to cooperate with the State. McMinn reviewed the written statement that Jessica gave to Ogle and concluded that she would probably not be needed as a witness, but he sent Reed a letter stating that Jessica would be subpoenaed.

Reed took Jessica out of school and sent her to stay with relatives in another city so that the subpoena could not be served. McMinn found out that Jessica was not in school. He warned Reed that she would be arrested and lose custody of Jessica if she did not tell him where the girl was. Reed refused to disclose where her daughter was staying. McMinn kept the pressure on Reed for a while and then promised that the girl would not be called as a witness for the State if Reed agreed to testify as instructed by District Attorney John Mann.

When Mann interviewed Reed to prepare her to testify, they reviewed the typewritten statement that she signed sign on the morning after the capital murder. Reed's statement described the story Mr. Skinner told her about finding Twila Busby in bed with her ex-husband:

> He told me he would tell me the truth about what happened. He told me he had come home from work and found Twila in bed with her ex-husband, He said he punched him in the nose and then kicked him

out of the house. Then he told me I had to swear to God that I would
not tell anyone what he was going to tell me. I told him I knew better
than that, that I don't talk out of school. That's when he said he
thought he had killed Twila. I asked him how and he said that he tried
to kick her to death (Ex. 2).

Reed asserted in her written statement that this was not the only story that Mr. Skinner made

her swear to keep secret:

He'd cry and make me promise not to tell nobody and he'd tell me
things that were real important to him from things like he loved me
to he killed Twila and <u>each time he'd say something he'd make me
promise not to tell</u>. He told me that he was going to tell me the truth
and I told him I could tell he was lying and he asked me how I could
tell he was lying and I told him because his lips were moving (Ex. 2)
(emphasis added).

Reed declared in her written statement that Mr. Skinner's last story about what happened to

his hand was interrupted when police arrived at her house to arrest him:

He then said that Ricky Palmer had broken into the house. That's all
he said about Ricky nothing about what happened after Ricky broke
into the house. We were sitting at the kitchen table. Hank was facing
the window on the front of my house and I had my back to it. Hank
said, "There's someone out there" (Ex. 2).

Reed assured Mann that her entire written statement was true, but she told him that she did

not believe that her testimony would help the State. Reed was surprised when Mann informed her

that she was going to be the State's star witness. She was anxious to please him because he still had

the power to involve her daughter in the case, but she did not believe that she knew anything that

could incriminate Mr. Skinner.

When Reed arrived in Ft. Worth for the trial, Gerhardt and McMinn met her at the airport

and warned her that she could not go anywhere or do anything without a police officer or a

prosecutor until she finished testifying. Gerhardt even tried to sleep in Reed's room. Gerhardt and

22

McMinn told Reed that this heavy security was necessary for her own protection, but she did not believe them because Mr. Skinner was incarcerated and there was no one in Ft. Worth who had a motive to harm her. Reed felt safer with Mr. Skinner in her house on the night of the capital murder than she did in the "protective" custody of the State in Ft. Worth.

Shortly before Reed testified, Assistant District Attorney Tracy Blades handed her a document in a clear plastic folder and told her, "read it. This is your part." Blades explained to Reed that it was a "condensed" version of her written statement to Ogle. Reed noticed that it took several parts of her statement out of context.

When Reed answered Mann's questions on direct examination, she tried to follow the script that Blades gave to her and repeat what she said in her written statement to Ogle. Reed falsely testified that Mr. Skinner entered her house without her consent or assistance, removed his shirt, washed the blood off of his watch, walked to the bathroom without assistance and threatened to kill her if she made a telephone call (Vol. 26 at 493, 495-97). Reed's conscience was not greatly troubled by those lies because she mistakenly believed that they were immaterial.

Mann elicited the most incriminating part of Reed's testimony by asking her the following questions:

> Q. Do you remember what you and [Mr. Skinner] talked about for a while?
>
> A. Yeah. He told me different stories about what happened to his hand.
>
> Q. Okay. Was there any discussion that night between you and Mr. Skinner about Twila and her ex-husband?
>
> A. Yes sir.

Q. Tell the ladies and gentlemen of the jury what he said to you about that subject.

A. He said that he had come home from work and caught Twila and her ex-husband in the bed and that he had hit the ex-husband in the mouth and then kicked him out the front door.

Q. Okay, well, <u>did her ever tell you another version about what had happened down there</u>?

A. He said something about Ricky Palmer had come to the house, but then he never finished that one.

Q. What, if anything, did he say to about what he thought, as he put it, had happened there?

MR. FIELDS: Objection. Leading, Your Honor.

THE COURT: Overruled.

A. <u>He said that he thought he had killed Twila</u> (Vol. 26 at 500-01) (emphasis added).

Reed did not realize that she gave the jury the false impression that Mr. Skinner told her three

separate stories about finding Twila in bed with her ex-husband, Ricky Palmer and kicking Twila

to death in that order.

Mann continued:

Q. Did he say anything to you right before that or about swearing an oath or something.

A. Yes sir. He said he was going to really tell me what really happened, but I had to swear to God that I would not ever tell anybody what he was fixing to tell me.

Q. Okay. what was your attitude about keeping a secret?

A. I told him, "Hank, you know me, I don't ever talk out of school."

Q. So then did he tell you something,

A. Yes.

Q. What did he tell you?

A. He told me he was-- that he thought he had killed Twila,

Q. Did he tell you how at that time he thought he had done it?

A. He said he thought he had kicked her to death (Vol. 26 at 500-01).

Q. Out of all the stories he told you that night which story was it that he made you swear to God not to reveal?

A. The one that he said that he thought he had kicked Twila to death.

Q. All right.

A. <u>Did he make you or ask you to swear not to reveal any of the others or just that one</u>.

Q. <u>Just that one</u>.

Q. I'm, sorry.

A. <u>Just that one</u> (Vol. 26 at 528) (emphasis added).

Reed knew that this part of her testimony contradicted her truthful written statement, but she gave Mann the answers that he wanted because she was afraid to do anything else.

Mann knew that Mr. Skinner's "confession" that he thought that he kicked Twila to death was not a separate version of what happened, the last version or the only one that he made Reed swear to keep a secret because Reed told him the truth when they reviewed her written statement.

Mann weaved the strands of Reed's false testimony into a tight noose in his closing argument:

We find Mr. Skinner back at Andrea Reed's house before we arrest him. having told her all these different stories about what happened. <u>And then  he get's down to the last one and the important one and</u>

says, "I want you to swear to God that you will not tell anybody and I'll tell you the truth about what happened...And he says I think I killed Twila. Or in Andrea's words, That's when he told me he thought he had killed Twila. He thought he had kicked her to death (Vol. 30 at 1548) (emphasis added).

Mann knew that this argument reenforced the false impression that he created when he questioned Reed. He deceived the jury because he understood that Mr. Skinner's "confession" would have lost most, if not all of its incriminating value if it had been presented in its true context.

Mr. Skinner's second chair trial counsel, Ken Fields had a copy of Reed's written statement when he cross-examined her, but he did not impeach her with it (Ex. 3). Fields asked Reed whether she believed that anything that Mr. Skinner said to her on the night of the capital murder was particularly credible. Reed said that she did not understand the question and Fields dropped the subject without rephrasing it (Vol. 26 at 527). Fields then asked Reed whether Mr. Skinner made a number of comments to her "about promising not to tell anybody" (Vol. 26 at 532). Reed said that she did not hear the question and Fields moved on to a different topic without repeating it (Vol. 26 at 532).

### Argument and Authorities

Mr. Skinner's conviction was tainted by three distinct violations of his right to due process. Mann knowingly used Reed's false testimony and made a misleading closing argument to create the false impression that Mr. Skinner confessed. Gerhardt and McMinn created false evidence about Mr. Skinner's ability to function when he was intoxicated at the time of the capital murder by threatening Reed. Those undisclosed threats were Brady material.

The False Impression

Mann's misconduct was the most serious constitutional error. "As a trustee of the State's interest in providing fair trials, the prosecutor is obliged to illuminate the court with the truth of the cause, so that the judge and jury may properly render justice." Duggan v. State, 778 S.W.2d 465, 468 (Tex. Cr. App. 1989). The due process clause forbids the prosecutor's knowing use of false testimony regardless of whether he intentionally elicited it. Napue v. Illinois, 360 U.S. 264, 269 (1959). This is a particularly egregious case because the prosecutor "deliberately misrepresented the truth." Miller v. Pate, 386 U.S. 1, 10 (1967). That "deliberate deception of court and jury by the presentation of testimony known to be" false was inconsistent with "the rudimentary demands of justice." Mooney v. Holohan, 294 U.S. 103, 112 (1935).

The truth was that Mr. Skinner told Andrea Reed that he thought that he kicked Twila Busby to death after he came home from work, caught Twila in bed with her ex-husband, punched him in the nose and kicked him out of the house. That story sounded exactly like the kind of macho fantasy that a jealous drunk emerging from an alcoholic blackout would have confabulated to fill in a gap in his memory. Mann transformed it into a confession to the murder of Twila Busby by using leading questions to do a masterful "cut and paste" job on Reed's written statement. Silk-Nauni v. Fields, 676 F. Supp. 1076, 1077-78 (W.D. Okla. 1987) (false impression created by taking defendant's statement out of context and rearranging the chronology of true events). First, Mann severed Mr. Skinner's statement that he thought that he kicked Twila to death from his story about finding Twila in bed with her ex-husband. Then, Mann distinguished the non-existent "confession" from all of the other obviously unbelievable stories that Mr. Skinner told Reed by asking her to falsely testify that it was his last story and the only one that he made her swear to keep a secret.

Reed's testimony about Mr. Skinner's statement that he thought that he kicked Twila to death was technically true because he did utter those words, but the false impression about their meaning that Mann created was no different from an outright lie. Alcorta v. Texas, 355 U.S. 28, 31 (1957). "Evidence may be false either because it is perjured or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true." Hamric v. Bailey, 386 F.2d 390, 393-94 (4th Cir. 1967); accord United States v. Barnham, 595 F.2d 231, 243 (5th Cir. 1979); Dupart v. United States, 541 F.2d 1148, 1149-50 (5th Cir. 1976); Turner v. Ward, 321 F.2d 918, 920 (10th Cir. 1963). "Omissions and half truths are equally damaging and prohibited and their use is no less culpable." Imbler v. Craven, 298 F. Supp. 795, 806 (C.D. Cal. 1969).

Mann is charged with the knowing use of Reed's false testimony even though no agent of the State had personal knowledge of what Mr. Skinner actually said to her. Alcorta v. Texas, 355 U.S. at 31; Yates v. State, 629 A.2d 807, 809 (N.H. 1993). The test is whether the prosecutor "actually knows or believes" that his witness's testimony was false. United States v. Sutherland, 656 F.2d 1181, 1203 (5th Cir. 1981) (emphasis added). In Alcorta v. Texas, the Supreme Court held that the prosecutor knowingly created a false impression by introducing a witness's testimony that he did not have an intimate relationship with the defendant's wife because the witness told the prosecutor before the trial that he had sex with her and the prosecutor believed him. 355 U.S. at 31. Mann believed Reed when she told him that her written statement contained a truthful account of what Mr. Skinner said to her. The fact that Reed made a prior inconsistent statement to Mann does not automatically prove that he believed that her testimony was false, Williams v. State, 513 S.W.2d 54 (Tex.Cr.App. 1974), but knowledge of the false impression can be imputed to him because he prompted her to

28

make the incriminating changes in her story. Alcorta v. Texas, 355 U.S. at 31; Turner v. Ward, 321

F.2d at 920; People v. Pelchat, 62 N.Y.2d 97, 106 (1984).[9]

Mr. Skinner was denied due process regardless of whether Reed intended to deceive the jury.

The test is whether the prosecutor believed that a witness's testimony was false: not whether the

witness did. Hamric v. Bailey, 386 F.2d at 393-94 (prosecutor charged with knowingly creating false

impression even though the testimony in question may have been literally true and the witnesses who

gave it were probably mistaken); Imbler v. Craven, 298 F.Supp. at 806 (prosecutor created false

impression by asking a leading question even if witness believed that his answer was true); People

v. Pelchat, 62 N.Y.2d at 106 (prosecutor had a duty to correct known false testimony even if the

witness misspoke or misunderstood his question).

Fields' failure to impeach Reed's false testimony about Mr. Skinner's confession with her

prior inconsistent written statement did not relieve Mann of his constitutional obligation to refrain

from knowingly using false or misleading testimony. Ex parte Fierro, 934 S.W.2d 370, 375

(Tex.Cr.App. 1996); Ross v. Heyne, 483 F.Supp. 798 (S.D. Ind. 1980); Yates v. State, 629 A.2d at

809. The "development of case law in this area teaches" that "the lack of diligence by defense

counsel" is never an excuse for the prosecutor's misconduct or a waiver of the defendant's right to

relief. Crutcher v. State, 481 S.W.2d 113, 114 (Tex.Cr.App. 1972); accord Barbee v. Maryland, 331

---

[9]     Assistant District Attorney Tracy Blades also contributed to the violation of due process by instructing Reed to testify in conformity with a condensed version of Reed's written statement that took the true facts out of context. Turner v. Ward, 321 F.2d at 920.

F.2d 842, 845 (4th Cir. 1964) ("the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel").[10]

Dr. Lowry did not correct the false impression that Mann knowingly created by testifying that Reed declared in her written statement that Mr. Skinner made her promise on more than one occasion to swear not to tell anyone what he said. State v. Morgan, 299 S.E.2d 614, 623 (N.C. App. 1982) (prosecutor's failure to correct the false impression of witness was not corrected when another witness admitted the truth). The discrepancy between Reed's testimony and Dr. Lowry's testimony about her written statement fell far short of informing the jury that her testimony was false. The jurors probably concluded that counsel did not introduce Reed's written statement or cross-examine her about it because it did not contradict her testimony, as Dr. Lowry claimed.

Mann exacerbated the false impression that Mr. Skinner confessed to the murder of Twila Busby by falsely characterizing Mr. Skinner's statement about kicking Twila to death as the last story that he told Reed about what happened. Miller v. Pate, 386 U.S. at 10-11; Walker v. State, 624 P.2d 687, 691 (Utah 1981); State v. Thompson, 396 S.W.2d 697, 702 (Mo. 1965). Mann knew that Mr. Skinner's last story was the one about Ricky Palmer.

In 1967, the Supreme Court condemned another prosecutor for creating such a false impression in his closing argument:

---

[10]    The rule of optional completeness did not relieve Mann of his constitutional obligation not to present evidence that created a false impression. The State can introduce part of a defendant's confession under that rule, Harrington v. Texas, 547 S.W.2d 616, 621 (Tex.Cr.App. 1977), even if there is a danger of "the fact finder receiving a false impression from hearing the evidence of only part" of a statement, Kinnamon v. State, 791 S.W.2d 84, 101 (Tex.Cr.App. 1990), but Reed's testimony about what Mr. Skinner said was false rather than incomplete.

> 30 years ago this Court held the Fourteenth Amendment cannot
> tolerate a state criminal conviction obtained by the knowing use of
> false evidence. There has been no deviation from that established
> principle. There can be no retreat from that principle here.

Miller v. Pate, 386 U.S. at 10-11. The principle is still valid 30 years later and there should be no
retreat from it here.

The false impression that Mann created about Mr. Skinner's confession is alone sufficient

to require a new trial because there is at least a grave doubt about whether it had a substantial and

injurious effect. O'Neal v. McAninch, 115 S. Ct. 992 (1995). Mr. Skinner easily met that burden

because a "'confession is probably the most probative and damaging evidence that can be admitted

against him." Arizona v. Fulminante, 111 S. Ct. 1246, 1258 (1991) (citation omitted).

If Mr. Skinner's statement had been truthfully presented as part of one of several unbelievable

stories that he told Reed to explain how he hurt his hand, the jury more likely than not would have

concluded that his statement that he kicked Twila to death was a confabulated drunken fantasy. The

jury would have concluded that this tale of jealous revenge was not true because all of the details

were contradicted by uncontroverted credible evidence. Mr. Skinner did not go to work on the date

of the offense. Twila's ex-husband did not go to bed with her that night. Mr. Skinner did not punch

her ex-husband in the nose. Twila was not kicked to death and he did not mention that her sons were

killed.

The false impression that Mr. Skinner confessed to the murder of Twila Busby had to

contribute to the verdict because the untainted "physical evidence from the scene and other

circumstantial evidence would have been insufficient to convict." Arizona v. Fulminante, 111 S. Ct.

at 1258; see also  Ex parte Brandley, 781 S.W.2d 886, 892 (Tex.Cr.App. 1989) (false testimony was

likely to affect the outcome of the trial because the untainted evidence was circumstantial); cf. Ex parte Fierro, 934 F.2d at 380-81 (false testimony about confession was harmless because of the unimpeached, uncontradicted testimony of an eyewitness who saw defendant commit the capital murder).  The State's failure to test several items of physical evidence that could have incriminated Robert Donnell would have raised a reasonable doubt about Mr. Skinner's guilt if Mann had not created the false impression that Mr. Skinner confessed.  Donnell, much more than Mr. Skinner, had the motive, means and opportunity to commit the murders. Donnell was a violent, hot tempered man who sexually molested a girl, grabbed a woman by the throat and carried a knife. He could have continued to stalk Twila when she left the party to avoid his rude sexual advances, unzipped her pants and raised her blouse with the intent of raping her, strangled her when she resisted and stabbed her sons. In all likelihood, the jurors were not troubled by the State's failure to establish Donnell's whereabouts at the time of the capital murder and determine whether he left his blood, hair, fingerprints and semen at the scene of the crime because they had the false impression that Mr. Skinner confessed that he murdered Twila.  This false impression was critical to the outcome of the trial.

### The *Brandley* and *Brady* Violations

Mr. Skinner's conviction must also be reversed because agents of the State conducted a biased investigation that blindly focused on establishing his guilt and made undisclosed threats to Andrea Reed which created false evidence that he was not too intoxicated to commit the capital murder. Ex parte Brandley, 791 S.W.2d at 892-94. "Although any of these incidences alone might not support" Mr. Skinner's claim for habeas corpus relief, "there can be no doubt that the cumulative effect of the investigative procedure judging the totality of the circumstances, resulted in a

32

deprivation of Mr. Skinner's right to due process of law by suppressing evidence favorable to the accused, and by creating false testimony and inherently unreliable testimony." Ex parte Brandley, 791 S.W.2d at 894.

The State violated its constitutional obligation under the rule of Brady v. Maryland, 373 U.S. 83 (1963), to disclose that Andrea Reed had a motive to lie because she was threatened with an arrest, United States v. Sutton, 542 F.2d 1239, 1242 (4th Cir. 1976), and the loss of custody of her daughter. United States v. Riley, 657 F.2d 1377, 1384 (6th Cir. 1981). Mann is charged with knowledge of those threats because they were made by members of the prosecution team. Ex parte Adams, 768 S.W.2d at 292. Evidence of a prosecution witness' motive to lie must be disclosed to the defendant if it is favorable to him and material to his guilt or punishment. United States v. Bagley, 473 U.S. 667, 677 (1985). This part of the Brady doctrine is commonly applied to undisclosed promises of leniency, but there is "no difference between concealment of a promise of leniency and concealment of a threat." United States v. Sutton, 542 F.2d at 1242.

The threats against Reed were Brady material regardless of whether they were truthful and lawful. United States v. Sutton, 542 F.2d at 1243. The test is whether the threat gave Reed an undisclosed motive to lie: not whether the person who threatened her had an improper motive for doing so. A truthful threat to lawfully arrest her or take away custody of her daughter was more likely to motivate her to lie than a false or illegal threat because it was more likely to be carried out.

Gerhardt and McMinn also created false evidence by threatening to charge Reed with a crime if she offered Mr. Skinner a place to hide from the police. Reed falsely claimed in her written statement and trial testimony that Mr. Skinner entered her house against her wishes, removed his shirt, washed the blood off of his watch, walked to the bathroom without assistance, threatened to

kill her if she made a telephone call and was capable of carrying out that threat because she wanted to convince the authorities that she did not offer sanctuary to a wanted murderer (Ex. 2). She honestly believed that these lies were irrelevant to Mr. Skinner's guilt or innocence, but they discredited his defense that he was physically incapacitated by his intoxication at the time of the capital murder.

Mr. Skinner does not have to show that Gerhardt and McMinn intended to cause Reed to commit perjury or establish that Mann knew that their threats created false evidence to prove that he was denied due process. Ex parte Brandley, 791 S.W.2d at 892-94. The State is just as responsible for the false testimony that the threats of its agents created as it would be if the prosecutor personally urged Reed to lie. Hysler v. Florida, 315 U.S. 411 (1942); United States v. Sutton, 542 F.2d at 1242; Ex parte Brandley, 781 S.W.2d at 893. The combination of the undisclosed threats, Reed's false testimony and the State's biased investigation "produced a trial lacking in the rudiments of fairness." Ex parte Brandley, 791 S.W.2d at 894.[11]

Mr. Skinner's conviction must be reversed because the false evidence that the State created had a substantial and injurious effect. O'Neal v. McAninch, 115 S. Ct. 992 (1995), and there is a reasonable probability that but for the suppression of exculpatory evidence he would have been acquitted. Kyles v. Whitley, 490 L.Ed.2d 490, 507 & n.9 (1995). On direct appeal, the Court of Criminal Appeals found that Mr. Skinner's defense that he was too intoxicated to commit the

---

[11]     This case is similar to Ex parte Brandley in several respects. A witness was threatened with an arrest and intimidated by agents of the State. The threats produced false testimony and a false statement to the police. 781 S.W.2d at 893-94 & n.8. The State maintained a "blind focus" on the defendant, disregarded leads that pointed to another suspect and failed to provide a plausible explanation for its decision not to perform hair comparison and serological tests that could have established whether that suspect was guilty. 781 S.W.2d at 890, 894.

murders was not particularly plausible in large part because of Reed's false testimony about his capacity to perform various tasks shortly after the offense, such as removing his shirt with no apparent difficulty and placing it on the back of a chair. Reed would have been a strong defense witness about his condition if she had truthfully described it. See United States ex rel Thompson v. Dye, 221 F.2d 763, 765-68 (3d Cir. 1955) (reversal required because State failed to disclose existence of witness who could have corroborated defense of intoxication at murder trial). The fact that Reed was threatened probably would have discredited her uncorroborated testimony about Mr. Skinner's "confession," as well as his condition.

The due process violation also more likely than not contributed to the jury's negative answer to the Penry special issue at the penalty stage. Reed's false testimony about Mr. Skinner's condition undermined Dr. Dickerson's opinion that he was functionally insane at the time of the offense due to voluntary intoxication (Vol. 33 at 2259). The jurors probably would have accepted that substantial mitigating factor if Reed had truthfully described how intoxicated he was when he arrived at her house.

IV.    MR. SKINNER WAS DENIED EFFECTIVE ASSISTANCE
OF TRIAL COUNSEL.

The Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), provides the standard for reviewing Mr. Skinner's claim of ineffective assistance of counsel. The Supreme Court adopted a two part test for ineffective representation that asks whether counsel's performance was deficient and whether the defendant was prejudiced by his mistakes. Strickland v. Washington, 466 U.S. at 687. The proper measure of an attorney's performance under the first prong of that test is "reasonableness under prevailing professional norms." Strickland v. Washington, 466 U.S. at 687.

35

The prejudice prong of the test asks whether the defendant has shown "that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694-95.

Mr. Skinner's court appointed attorneys, Harold Comer and Kenneth Fields, were ineffective because they unreasonably failed to introduce evidence, ask questions and make arguments that would "'put the whole case in such a different light as to undermine confidence in the verdict.'" Westley v. Johnson, 83 F.3d 714, 719 (5th Cir. 1996) (quoting Kyles v. Whitley, 131 L.Ed. 2d 490, 506 (1995)).[12] Fields has admitted in a sworn affidavit that he neglected to impeach Andrea Reed's false testimony about Mr. Skinner's confession with her truthful prior inconsistent written statement (Ex. 3). Comer neglected to elicit testimony that Robert Donnell tried to rape Twila Busby more than once. Both lawyers ignored Mr. Skinner's request to present evidence of his allergy to codeine that would have greatly strengthened his defense. Perhaps worst of all, they chose not to have scientific tests performed that would have established Mr. Skinner's innocence because they did not understand that the law allowed them to explore that option at no risk.

Counsel's Ineffective Cross-Examination of the State's Star Witness

Second chair counsel Ken Fields committed "a single, serious error" during his cross-examination of the State's star witness that alone violated Mr. Skinner's right to effective representation. Kimmelman v. Morrison, 477 U.S. 365, 383 (1986). Andrea Reed testified on direct

---

[12]     Comer is charged with responsibility for the ineffective performance of his private investigator, Kirvin Roper. Comer knew that Roper was not qualified because Comer fired for him for incompetence and embezzling when he worked for Comer in the district attorney's office.

examination that Mr. Skinner told her that he thought that he killed Twila Busby by kicking her to death (Vol. 26 at 500-01). She distinguished that statement from the other unbelievable stories that Mr. Skinner told her to explain how he injured himself by characterizing it as a separate statement, the last explanation that he gave and the only one that he made her swear to keep a secret (Vol. 26 at 500-01, 528). Fields knew that he could impeach this crucial part of Reed's testimony by confronting her with the prior inconsistent statement that she made to Officer Ogle on the night of the capital murder (Ex. 3). Reed declared in her written statement that: Mr. Skinner's statement about kicking Twila to death was part of a story about finding her in bed with her ex-husband; Mr. Skinner started to tell her another story about Ricky Palmer after he finished that one; and Mr. Skinner made her swear to keep each story a secret before he told it to her (Ex. 2). Fields began to lay the foundation for impeaching Reed with this prior inconsistent statement, but he abandoned the attack for no reason (Vol. 26 at 527, 532).

Fields' failure to impeach Reed's testimony about Mr. Skinner's confession was clearly unreasonable because she told him before the trial that her written statement was true and her credibility would have been badly damaged if she denied it. Ex parte Guzmon, 730 S.W.2d 724, 727-28 n.2 (Tex.Cr.App. 1987) (ineffective lawyer failed to impeach testimony about a confession that may have been false); Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995) (ineffective lawyer failed to impeach prosecution witness' testimony about defendant's confession with prior inconsistent statement). There can be no tactical justification for allowing Reed to escape impeachment because Fields has admitted that he dropped the ball.

Counsel's Ineffective Closing Argument

Comer and Fields made a serious blunder when they failed to argue to the jury that Officer

Morse Burroughs' expert analysis of the blood spatters on Elwin Caler's undershorts provided a

strong innocent explanation for the blood on Mr. Skinner's clothes. Summit v. Blackburn, 795 F.2d

1237 (5th Cir. 1986); Qartero v. Fogg, 679 F. Supp. 212 (E.D. N.Y.), aff'd, 849 F.2d 1467 (2d Cir.

1988). Burroughs' opinion that Caler was in Twila's immediate vicinity when she was clubbed to

death should have been used as the linchpin of a powerful closing argument that the blood on Mr.

Skinner's clothes was no more incriminating than the blood on Caler's undershorts. Comer and Fields

should have argued that it was reasonable to infer that Caler emerged from his bedroom in his

undershorts, saw the killer hitting Twila with the ax handle in the living room near the couch that

Mr. Skinner was laying on in a coma, and tried to protect his mother. Twila's blood could have

spattered on Caler's undershorts and Mr. Skinner's clothes at the same time because they were both

in her immediate vicinity. The killer could have grabbed a knife and stabbed Caler near the couch

where Mr. Skinner was laying.[13] Caler's blood could have spattered on Mr. Skinner's clothes or Caler

could have fallen on top of him when he was bleeding. Mr. Skinner could have escaped through the

back door when the killer chased Caler out the front door.

The jury could not be expected to understand these complex exculpatory "inferences to be

drawn from" Burroughs' opinion about the blood stains on Caler's undershorts without an effective

summation to "sharpen and clarify the issues for resolution," Herring v. New York, 422 U.S. 853,

---

[13]     There were three plausible explanations for the switch of weapons. The killer could have: 1)
dropped the ax handle during a struggle with Caler; 2) abandoned the ax handle because it was too
difficult to use at close range to bring down a 6'6" tall man who was fighting for his life; or 3)
obtained control of a knife that Caler brought into the living room in a failed attempt to save his
mother.

862 (1975), because the prosecutor urged the jurors to draw a competing inference about where Caler was when he was stabbed. Comer and Fields could have used Burroughs' opinion to completely discredit the prosecutor's hypotheses that Mr. Skinner left his bloody hand print 18 inches above the floor on the door frame "when Elwin Caler came out of that bottom bunk" and knocked him down (Vol. 30 at 1607-08).[14] If Caler was in the immediate vicinity of Twila when she was murdered in the living room, as Burroughs concluded, he obviously did not go back to the bedroom, climb into his bunk without waking up his brother, wait there until the killer came after him and try to escape again.

Counsel's Unreasonable Failure to Prove that Mr. Skinner Was Allergic to Codeine

Comer and Fields failure to prove that Mr. Skinner was allergic to codeine was unreasonable because that evidence would have eliminated a major weakness of their defensive theory that Mr. Skinner was incapacitated by codeine and alcohol at the time of the offense. In re Sixto, 48 Cal. 3d 1247 (1989) (ineffective attorney failed to present expert testimony that would have strengthened drug intoxication defense); Harris ex rel Ramsayer v. Wood, 64 F.3d 1432 (9th Cir. 1995) (ineffective attorney failed to inform his expert about evidence that supported a scientific defense). About two months before the trial, Mr. Skinner informed Comer in a letter, "I am allergic to codeine" and "this allergy is well documented in my medical records" (Ex. 9). Mr. Skinner urged Comer to retain a toxicologist because an expert "would be needed to testify as to the effects of suffering an allergic reaction while also under the influence of a large amount of alcohol" (Ex. 9).

---

[14]   Counsel's failure to take advantage of this opportunity to discredit the prosecutor's argument about how Mr. Skinner's bloody hand print ended up in that unusual location also damaged the credibility of Dr. Lowry's opinion that Mr. Skinner probably made the hand print when he fell down in a drunken stupor.