IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| HENRY W. SKINNER, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | 2:99-CV-0045 |
| DOUGLAS DRETKE, DIRECTOR, | § | ** Capital Litigant ** |
| TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE, | § | |
| CORRECTIONAL INSTITUTIONS | § | |
| DIVISION, | § | |
| | § | |
| Respondent. | § | |

FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636 (b), implemented by an order of the United States

District Court for the Northern District of Texas.  The Findings, Conclusions, and

Recommendation of the United States Magistrate Judge follow:

I.
NATURE OF THE CASE

The petitioner, HENRY W. SKINNER, a state prison inmate has filed a petition for writ

of habeas corpus pursuant to Title 28, United States Code, Section 2254.

II.

PARTIES

Petitioner, Henry Skinner, is an inmate in the custody of the Texas Department of

Criminal Justice, Correctional Institutions Division (TDCJ-CID).  Respondent, Douglas Dretke,

is the Director of TDCJ-CID.

III.

PROCEDURAL HISTORY

Petitioner was convicted by a jury of capital murder, and his punishment was assessed at

death by lethal injection.  *State v. Skinner*, Cause No. 0005216 (District Criminal Court No. 3 of

Tarrant County, Tex. March 22, 1995).[1]  The case was appealed to the Texas Court of Criminal

Appeals, and the Court of Criminal Appeals affirmed the conviction and death sentence in a

published opinion.  *Skinner v. State*, 956 S.W.2d 532 (Tex. Crim. App. Sept. 10, 1997).

Petitioner filed an initial state application for writ of habeas corpus on March 26, 1998.  The

Texas Court of Criminal Appeals dismissed this initial application based upon the trial court's

determination that it was untimely filed.  Petitioner then filed his initial federal habeas petition in

this Court on February 5, 1999.  On August 1, 2000, this federal proceeding was administratively

closed and all proceedings were stayed so petitioner could return to state court to once again

present his habeas claims.  Petitioner became eligible to return to state court because Texas law

had changed to allow previously untimely state applications to be considered on their merits.  *See*

TEX. CODE CRIM. PROC. ANN. art. 11.071 § 4A(f) (Vernon's Supp. 1999).

Petitioner's second state habeas application was filed on February 27, 2001.  On October

---

[1]The venue was changed from Gray County to Tarrant County.

10, 2001, the Court of Criminal Appeals dismissed the application, invoking the rule of habeas corpus abstention, on the basis that there was a pending federal petition.  *Ex parte Skinner*, No. 20,203-04 (Tex. Crim. App. Oct. 10, 2001).  The state court dismissed the state petition on this ground even though the federal court had stayed the case solely to allow petitioner's claims to be presented to the state courts.

Petitioner then returned to federal court and filed another habeas corpus petition on July 19, 2002.  Respondent filed a motion to dismiss the petition, arguing petitioner's claims remained unexhausted and that this Court should dismiss the petition, rather than hold it in abeyance, in order for petitioner to return yet again to state court to exhaust his claims.  On September 12, 2002, the undersigned issued a Report and Recommendation, recommending Respondent's motion to dismiss be denied.  Specifically, this Court held petitioner should not be *required* to return to state court and again attempt to exhaust his state remedies since this Court had previously stayed all federal proceedings for the express purpose of allowing petitioner to re-file in state court and exhaust his state court remedies, only to have the state courts refuse to address the merits of the case.  In recommending denial of the motion to dismiss, the undersigned also found that, should the federal petition be dismissed rather than stayed, the one year AEDPA statute of limitations would have run, and limitations would have to be equitably tolled for the federal courts to consider any future federal petition.  Thus, while Respondent had stated that it would not oppose equitable tolling and would not raise the statute of limitations as a defense in the future, petitioner could not be guaranteed any subsequent federal court hearing the

matter would accept such a waiver or would not otherwise find the petition to be time barred.[2]

The district court overruled objections filed by Respondent and adopted the Magistrate Judge's

recommendation by Order, dated September 27, 2002.

Petitioner then filed an amended petition for writ of habeas corpus on December 2, 2002.

Respondent filed an answer on July 25, 2003, and furnished the state court records.  Petitioner

filed a reply on December 5, 2003.  On May 18, 2004, this Court granted, in part, petitioner's

December 5, 2003 motion for discovery.  Pursuant to that Order, a deposition was taken on July

21, 2004.  On November 16-18, 2005, an evidentiary hearing was held, covering an agreed-to list

of disputed issues submitted by the parties on October 3, 2005.  These disputed issues included

facts relevant to petitioner's first through fifth and eighth claims for relief.  Both parties filed

post-hearing briefs on March 6, 2006, and reply briefs on March 14, 2006.


IV.
RULE 5 STATEMENT

Respondent asserts petitioner has failed to exhaust his state court remedies on all of the

claims he raises in this Court.  Respondent has reurged failure to exhaust throughout the

proceedings in this Court and has not waived exhaustion.  As set forth in paragraph VIII., the

undersigned is of the opinion this case should not be dismissed based upon any alleged failure to

exhaust.

---

[2]The undersigned acknowledges that it is very probable respondent's statement that it would not oppose equitable tolling as to any future federal petition would result in petitioner being able to pursue federal habeas corpus relief.  As probable as that scenario is, however, it still is not a guarantee that this Court, the Court of Appeals, or the Supreme Court, might eventually decide otherwise or determine that, as a matter of law, equitable tolling was not available.  Since the initial federal habeas case was administratively closed and held in abeyance solely to allow petitioner to exhaust his state habeas corpus remedies and the state court refused to entertain such application, there is no logical reason petitioner should be put at risk of forfeiting his right to seek federal habeas corpus relief, however slight that risk might be.

V.

ISSUES

Petitioner raises the following nine claims:

1.    Petitioner was denied his due process rights when the prosecution elicited
      testimony from a witness that gave the false impression that petitioner had
      confessed to murder;

2.    Petitioner was denied his due process rights because the State, through
      threats and intimidation, caused a witness to give false testimony
      regarding petitioner's condition on the night of the crime;

3.    Petitioner was denied his due process rights because the prosecutor failed
      to disclose that a witness was threatened by law enforcement;

4.    Petitioner's rights under the Sixth Amendment were violated because he
      was denied the effective assistance of counsel during trial;

5.    Petitioner was denied his Sixth Amendment right to counsel because the
      his lead defense attorney had an actual conflict of interest that petitioner
      did not waive;

6.    Petitioner was denied his Sixth Amendment right to counsel during the
      motion for new trial stage of the proceedings;

7.    Petitioner was denied his due process rights because the trial court ordered
      petitioner to disclose his toxicology expert's work product to the State;

8.    Petitioner's was denied his Sixth Amendment right to counsel because the
      Sheriff read and copied privileged correspondence between petitioner and
      his attorneys while petitioner was incarcerated in jail awaiting trial; and

9.    The trial court violated petitioner's Sixth Amendment right to consult with
      counsel by ordering the bailiff to separate petitioner from his attorneys
      during recesses at trial.

VI.

STANDARD OF REVIEW

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996

(the AEDPA), 28 U.S.C. § 2254, provide:

(d)     An application for a writ of habeas corpus on behalf of a person in custody
        pursuant to the judgment of a state court shall not be granted with respect to any
        claim that was adjudicated on the merits in State court proceedings unless the
        adjudication of the claim –

    (1)     resulted in a decision that was contrary to, or involved an unreasonable
            application of, clearly established Federal law, as determined by the
            Supreme Court of the United States; or

    (2)     resulted in a decision that was based on an unreasonable determination of
            the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and

fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the

"contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court

arrives at a conclusion opposite to that reached by the United States Supreme Court on a

question of law or if the state court decides a case differently from the United States Supreme

Court on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 412-3

(2000).  With respect to the "unreasonable application" clause, a federal court may grant a writ

of habeas corpus if the state court identifies the correct governing legal principle from the United

States Supreme Court's decisions, but unreasonably applies that principle to the facts of the

prisoner's case. *Williams*, 529 U.S. at 413.  Under *Williams*, a state court unreasonably applies

Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court]

precedent to a new context where it should not apply or unreasonably refuses to extend that

principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir.

2000), *cert. denied*, 532 U.S. 949 (2001).  Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5[th]Cir.) (as modified on denial of rehearing), *cert. denied*, 531 U.S. 1002 (2000).  The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).  This statute applies to all federal habeas corpus petitions which, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Resolution on the merits in the habeas corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

When, however, there has been no resolution on the merits by the state courts, the federal courts do not utilize the deferential standards under the AEDPA and review is *de novo.  Solis v. Cockrell*, 342 F.3d 392, 394 (5th Cir. 2003); *Miller v. Johnson*, 200 F.3d 274, 281 n. 4 (5th Cir. 2000).

Since there has been no adjudication on the merits by the state courts of any of petitioner's claims in this federal position, except for petitioner's claim number 7 involving disclosure of attorney work product, then the AEDPA deferential standards are inapplicable to petitioner's claims 1-6 and 8-9.

## VII.
## FACTUAL BACKGROUND

The Texas Court of Criminal Appeals recited the following factual background in its

opinion on direct appeal:

Appellant lived with his girlfriend, Twila Busby, and her two mentally-retarded sons, 22-year-old Elwin Caler and 20-year-old Randy Busby. Around 9:30 on the evening of December 31, 1993, Twila and appellant called a friend of Twila's, Howard Mitchell, and told him they wanted to go to his New Year's party, but needed a ride there. Between 10:15 and 10:30 p.m., when Mitchell went to pick up the pair, he found appellant passed out on the couch and was unable to wake him. Apparently, appellant had been drinking.

Leaving appellant in his stupor, Twila and Mitchell went to Mitchell's trailer where a party was in progress. Twila was followed around at the party by her drunken uncle who made rude sexual advances toward her and generally agitated her until she asked Mitchell to take her home. Mitchell drove Twila home between 11:00 and 11:15 p.m., and left.

At midnight, Police Officer Fred Courtney was dispatched to investigate a stabbing at an address located across the alley from appellant's residence. He arrived to find Elwin Caler sitting on the porch of a neighbor's house with a blanket pressed against his side. Elwin had a mortal stab wound under his left arm and superficial wounds to his right hand and stomach. He was taken to the hospital where he died at 12:45 a.m.

Four blocks away, also at midnight, appellant knocked at the door of his former girlfriend, Andrea Reed. Reed asked appellant to leave, but he entered the house and told her that she had to help him because he had been stabbed and shot. Appellant's shirt and pants had a great deal of blood on them. Appellant removed his shirt, but Reed could find no injuries except for a bleeding cut in the palm of his right hand, which she agreed to suture.

Reed and appellant conversed for almost three hours during which time appellant made a series of inconsistent statements about the cause of and events surrounding his injury. At one point Reed attempted to leave the room to call the police, but appellant stopped her and threatened to kill her. Reed told him she was going to call Twila to ask her what happened and appellant claimed that he caught Twila in bed with her ex-husband and fought with him. Eventually, appellant offered to tell Reed what really happened if she would promise not to reveal it to anyone. When Reed promised not to tell, appellant stated that he thought he had kicked Twila to death.

While appellant was at Reed's house, the police were investigating Elwin's stabbing. As they approached the house where Elwin lived with his mother, brother, and appellant, the police noticed a trail of blood spots on the ground running from the front porch to the fence line. There was a blood smear on the

glass storm door and a knife on the front porch.  Upon entering the residence, the police found Twila's dead body on the living room floor.  It was later determined that she had been strangled into unconsciousness and subsequently beaten at least fourteen times about the face and head with a club.  An ax handle stained with blood and hair was leaning against the couch near the body and a black plastic trash bag containing a knife and a towel with wet brownish stains on it was laying between the couch and the coffee table.

Officer Morse Burroughs proceeded to the bedroom where Elwin and Randy usually slept in bunk beds.  He found Randy's dead body laying face down on the upper bunk, covered by a blood spotted blanket.  Randy had been stabbed in the back three times.  A door leading out of the bedroom and into a utility room yielded further evidence.  Burroughs noticed a bloody handprint located about 24 inches off the floor on the frame of this door.  He also noted a bloody handprint on the door knob of the door leading from the kitchen to the utility room and a handprint on the knob of the door exiting from the utility room into the backyard.

The police arrested appellant at Reed's house at approximately 3:00 a.m.  They found him standing in a closet wearing blood-stained socks and blood-stained blue jeans.  He appeared intoxicated.  A toxicological test on a blood sample appellant voluntarily provided at 5:48 a.m. showed appellant to have 0.11 milligrams of codeine per liter of blood and a blood alcohol level of 0.11 percent.  Tests on the blood on appellant's clothing was found to belong to Twila and Elwin.  In a tape-recorded statement to the police, appellant claimed to remember little of what happened on the night of the murders after he fell asleep on the couch.  Autopsy evidence showed all of the murders to have been committed in the same general time frame.

*Skinner*, 956 S.w.2d at 4-5.

VIII.
<u>PROCEDURAL ISSUES</u>

Respondent asserts none of petitioner's claims should be considered on their merits

because they were not exhausted at the state level.  Respondent argues that, because the state

court dismissed petitioner's two state habeas applications on procedural grounds, petitioner's

federal habeas petition should be dismissed without prejudice to allow petitioner to exhaust his

claims at the state level.  Alternatively, Respondent asserts that if this Court opts not to dismiss

the petition, the only alternative is for all claims to be denied on their merits by this Court.

Under 28 U.S.C. § 2254(b)(1), an application for writ of habeas corpus shall not be granted unless it appears the applicant has exhausted the remedies available in the state courts or there is an absence of available state corrective process or circumstances exist that render such process ineffective to protect the applicant's rights.  In his reply, petitioner contends he has exhausted his state court remedies.  First, petitioner argues he exhausted his state court remedies because, when he filed his initial federal habeas petition in this Court on February 5, 1999, there were no state remedies available to him because his state application had been dismissed.  Second, petitioner argues his claims were again fully exhausted when he returned to state court and re-attempted to have his claims considered because the Court of Criminal Appeals had a "full and fair opportunity" to consider the claims, but dismissed the petition under the habeas abstention rule because there was a pending federal petition.  As support for this position, petitioner cites *Carter v. Estelle*, 677 F.2d 427 (5th Cir. 1982).  In *Carter*, the Fifth Circuit held that Carter had met exhaustion requirements when he attempted to file a state application for writ of habeas corpus, but his application was dismissed by the Texas Court of Criminal Appeals under the state doctrine of habeas abstention because his federal case was still pending.  Specifically, the Fifth Circuit, citing to the then applicable statute which, like the AEDPA, stated that exhaustion was not required if there was an absence of state corrective process or circumstances render the process ineffective to protect a prisoner's rights, held that as there was at the point Carter filed his state application no available, adequate state remedy, exhaustion was not required.  *Id*. at 450.

In essence, then, petitioner is arguing there is an absence of available state corrective

process and/or that circumstances exist that render the process ineffective to protect his rights.
*See* 28 U.S.C. § 2254(b)(1)(B)(I) & (ii).  Admittedly, *Carter* is a pre-AEDPA case, and the facts are not identical to the ones in the instant case.  However, *Carter* has been cited with approval by the Fifth Circuit in AEDPA cases, albeit under different factual circumstances.  *See Orman v. Cain*, 228 F.3d 616, 620 n. 6 (5th Cir . 2000), *Dilworth v. Johnson*, 215 F.3d 497, 501 n.3 (5th Cir. 2000).  In the instant case, petitioner attempted to fully exhaust his state court remedies two times.  The first state habeas petition was dismissed as having been filed out of time.  It is not at all clear that a state petition dismissed as untimely would constitute adequate exhaustion. Instead, dismissal of a petition as untimely would more properly be characterized as a dismissal on a procedural ground rather than a dismissal on the merits.  The second state petition, however, was filed after the State of Texas changed the law to allow petitioners, such as petitioner Skinner, an opportunity to re-file state habeas applications that were previously deemed untimely.[3]  This Court then stayed the federal proceedings specifically to allow petitioner a second attempt to seek state habeas relief.  In doing so, this Court declined to dismiss the case in order to prevent petitioner's one-year filing limitation under the AEDPA from being considered as having run before he could re-file in federal court.  The state court opted to dismiss the state application under the state habeas abstention rule and declined to consider the merits.  Under the rationale of *Carter*, it does appear that there was no available, adequate state remedy, at least at the time petitioner filed his second state habeas application and when it was dismissed.

Respondent, however, contends a state corrective process is still available to petitioner

---

[3]Had the Texas legislature not passed this statute allowing petitions which had been previously dismissed as untimely, an opportunity to be heard in the state courts, an interesting question would have been presented concerning whether petitioner would be entitled to seek federal habeas corpus relief or would be procedurally barred from seeking such federal habeas corpus relief if his only state court petition had been dismissed on procedural grounds as untimely.

because this Court could dismiss the federal petition and respondent has stated he will not assert

the one-year time limitation as a procedural bar if and when petitioner returns to federal court.

Furthermore, respondent argues that this Court could prospectively issue an order stating it

intends to equitably toll the statute of limitations on any potential future federal petition filed by

petitioner after returning to state court.  Some support for respondent's position can be found in

the statute itself, as § 2254(c) states that a petitioner will not have been deemed to have

exhausted his available state court remedies if he has the right under state law to raise, by any

available procedure, the question presented. *See* 28 U.S.C. § 2254(c).  And Respondent, citing

*Edwards v. Carpenter*, 529 U.S. 446, 453 (2000), argues that petitioner's claims have not been

properly exhausted because they were not presented to the state court in a manner that the state

court, following its own procedural rules, could have considered them.  But, this language in

*Carpenter* was dicta and was largely quoted from the earlier case of *O'Sullivan v. Boerkel*, 526

U.S. 838 (1999), in which the Supreme Court held that, in order for the exhaustion requirement

to be fulfilled, a state prisoner is required to file a petition for discretionary review to the state

supreme court when it is part of the ordinary appellate process in that state.

  It remains the opinion of the undersigned, however, that petitioner Skinner has attempted

to file a state habeas application with the highest state court in good faith.  And, while there may

still be some theoretical procedure by which petitioner could raise his claims in state court a

third time, it would be at the risk of suffering dismissal of a timely filed federal petition.  Instead,

this Court finds the Fifth Circuit's holding in *Carter v. Estelle* to be largely on point and

persuasive.  Accordingly, this Court finds that it should consider petitioner's claims on their

merits, because there was an absence of available state corrective process at the time that

petitioner filed his second state habeas application and that circumstances exist that render the process ineffective to protect his rights at this time, given that the AEDPA's one year statute of limitation for filing a federal habeas petition would run should this Court dismiss petitioner's current petition with no absolute assurance that a future federal court, whether trial court or appellate court, would grant petitioner equitable tolling. *See* 28 U.S.C. § 2254(b)(1)(B)(I) & (ii).[4]

Alternatively, even if petitioner has not properly exhausted his state remedies and has not met the requirements of 28 U.S.C. § 2254(b)(1)(B)(I) & (ii), under § 2254(b)(2) this Court may also deny petitioner's unexhausted claims on their merits. As this Court has determined that petitioner's claims are without merit, they may properly be addressed and denied on their merits notwithstanding any failure to exhaust at the state level.[5]

IX.
EXAMINATION OF THE ISSUES

A.
False Testimony Claims

Grounds 1, 2, and 3

In his first ground for relief, petitioner asserts the State knowingly elicited false testimony from one of its witnesses, Andrea Reed. Petitioner asserts this false testimony was material because it gave the false impression petitioner had confessed to killing Twila Busby and because it directly contradicted the defense theory that petitioner was too intoxicated to have

---

[4]In *Ex parte Soffar*, 143 S.W.3d 804, 804-5 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals did modify its habeas abstention doctrine, holding that it would from that point on consider subsequent state court writs if the proceedings were stayed in federal court. Any state writ petitioner might file in the future, however, would not be a subsequent writ because no state writ has been considered on its merits as of yet.

[5]The record before this Court does indicate that petitioner did exhaust the portion of his seventh ground for relief in which he alleges that his due process rights were violated because a defense expert's work product was provided to the prosecution because petitioner made this same due process claim on direct appeal. *See Skinner*, 956 S.W.2d at 537. This Court has determined that this claim is also without merit.

been physically and mentally capable of committing the murders.  In his second ground for relief, petitioner claims witness Reed gave this false testimony because she was threatened and intimidated by authorities.  In his third ground for relief, petitioner alleges he was denied due process because the prosecutor did not disclose that witness Andrea Reed was threatened by agents of the State.

*Applicable Facts*

At the evidentiary hearing held in November of 2005, Andrea Reed testified.  In her testimony, she recanted portions of a statement she had given to the police the day petitioner was arrested and she recanted several statements she made when testifying at petitioner's trial. Specifically, at the federal evidentiary hearing she stated that, while she had testified at trial that she did not know how petitioner entered her trailer shortly after midnight, January 1, 1994, the truth was that she let him in the trailer, and that it was necessary for her to help him up the porch and into the trailer.  She further testified she had lied at trial when she said petitioner had taken off his shirt and laid it on a chair.  She said the truth was that he had unsnapped the shirt but she had taken it off of him and laid it over the top of a chair. (Evidentiary hearing, vol. I, p. 228-29). She also testified she lied at trial when she stated petitioner went to the bathroom in her trailer on his own, and the truth was that she helped him down the hall into the bathroom and then helped him back down the hall afterwards. (E.H. I:230-31).  Reed testified she lied at trial when she stated petitioner was heating up sewing needles and attempting to bend them so he could sew up his hand, and the truth was that she was doing that. (E.H. I:229-30).  Reed also stated that, contrary to her trial testimony, petitioner never said that he would kill her if she tried to call anybody, but only said that she should not call anyone. (E.H. I:231).  Reed further stated

petitioner swore her to secrecy about every story that he told her, not just the story that he kicked

Twila to death. (E.H. I:231-32).  Reed did acknowledge that, while she assisted petitioner out of

his shirt, he could have taken it off himself but for the injury to his hand. (E.H. II:287).

Reed also testified at the federal evidentiary hearing that, after the police officers arrived

at her home on January 1, 1994, to arrest petitioner, Officer Katie Gerhardt told her she could be

arrested if she had allowed petitioner into her home knowing there were warrants against him.

(E.H. I:233-34).  Reed testified Gerhardt did not believe the answers she was giving to questions

and kept asking her how petitioner got into her house. (E.H. I:235-36).  Reed stated she was

frightened after she heard Gerhardt tell a neighbor, Gerry Douglas, who was outside, to stay

away from the (Reed's) house because it was a triple-homicide crime scene. (E.H. I:238).  Reed

also stated she was told she could not leave her hotel room in Fort Worth during the trial, and

before trial she was given a piece of paper from one of the prosecutors, Tracy Jennings, and was

told that was what she was supposed to say in her testimony. (E.H. I:243-44).  Reed testified she

made incorrect statements in her written statement to the police, and at trial because she did not

want the authorities to think she was involved with Skinner and did not want to go to jail. (E.H.

I:241)

Respondent called several witnesses to rebut Reed's evidentiary hearing testimony.

Gerry Douglas testified he was Reed's neighbor and that his trailer was right behind her trailer.

He further testified he was outside on January 1, 1994, when petitioner was brought out of

Reed's house by police officers.  He stated Reed came back to his house at around 3:00 or 4:00

a.m. hysterical and scared, and told him she had been down to the police station to make a

statement.  Douglas testified Reed told him petitioner had come barging into her house and had

run into the back bedroom, that she was upset because petitioner had threatened her, telling her

that if she told anyone where he was hiding that he would kill her and her kids. (E.H. III:749-53).

Connie Neighbors, petitioner's ex-wife, testified she was Reed's best friend at the time of the

murders, that Reed came to the house where she (Neighbors) was staying at around 8:00 or 8:30

a.m. on January 1, 1994, that Reed practically broke the door down trying to get in, and that

Reed was shaking and crying because she was frightened.  Neighbors testified Reed told her that

morning that petitioner had been to her house, had told her that he thought he had killed Twila

and the boys, he wanted her to sew up his hand, and he had threatened her and her children if she

called anyone. (E.H. III:804-07).  At no time did Reed say anything about being threatened or

coerced by the police department or the district attorney's office. (E.H. III:808).

　　　The parties stipulated that, if called to testify, Andrea Reed's daughter, Jessica Reed,

would testify that, while she no longer recalls what she wrote in her statement, what she stated in

her statement to the police on January 1, 1994, is what happened that morning. (E.H. III:810-11).

In her statement to the police, Jessica Reed stated she was watching television when she heard

someone banging loudly on the front door, that her mother asked who it was, that petitioner

responded it was him, and that petitioner had entered the house by the time her mother reached

the living room. (Resp. Hearing Ex. #6).  In this statement, Jessica Reed also stated that, at some

point, she heard petitioner ask her mother where the bathroom was and then stated that he knew

where it was and that, after petitioner exited the bathroom, her mother told him to go back to the

living room. *Id.*

　　　Former District Attorney John Mann testified he never instructed Reed how she should

testify and never personally interviewed her before she took the stand at the trial. (E.H. III:728-

29).  He also testified that, while in Fort Worth, all of the people staying at the Holiday Inn were

encouraged to exercise caution and not to go out after dark because it was not a good part of

town.  He said there was a shooting incident near the motel during the trial. (E.H. III:729-31).

Connie Lockridge testified she was an officer with the Pampa police department at the time of

the murders and that she interviewed Reed at the police station on January 1, 1994 and took her

written statement.  Lockridge testified she viewed Reed as a victim because she was obviously

frightened for her and her children's safety.  Lockridge testified she never warned Reed that she

could be prosecuted as an accessory, and she did not believe Reed could be prosecuted as an

accessory based on her behavior that morning. (E.H. III:769-75).  Finally, she testified she did

not threaten or even try to persuade Reed regarding what she said in her written statement. (E.H.

III:788).

        Katie Gerhardt testified that, at the time of the murders, she was a sergeant with the

Pampa police department, that she went to Reed's home in the early morning hours of January 1,

1994, that she did tell neighbors to stay away from Reed's home because it was a murder crime

scene, that she did not ask Reed whether petitioner had an accomplice, that she did not recall

ever telling Reed she could be charged as an accessory or for harboring a fugitive, and that she

never told Reed her daughter would not be subpoenaed if Reed testified as the District Attorney

wanted her to testify.  Gerhardt further testified Reed was very nervous, was pacing, and kept

attempting to tell the police things, although she was told that she could give a statement later.

(E.H. III:813-16, 819).  Gerhardt testified she never required Reed to stay in the same hotel room

with her in Fort Worth, but offered to stay in the same room with Reed because Reed had said

she was afraid petitioner would have her killed. (E.H. III:817-18).

Tracey Jennings testified at the hearing and stated she was an assistant district attorney at the time of petitioner's trial.  Jennings further testified she talked to Reed about her testimony before trial in Fort Worth, that she would have only shown Reed her own written statement, rather than a prepared script, and that Reed never told her that her written statement was inaccurate or was not true. (E.H. III:822-23, 829-30).  She also testified she remembered the shooting incident near the motel and remembered that everyone was cautioned about being careful and not going anywhere alone or at night. (E.H. III:824).

*Applicable Law*

The Supreme Court has held that the presentation of false evidence at trial, as well as the admission into evidence at trial of false evidence that, even though not solicited, is not corrected, violates a criminal defendant's due process rights, if the reliability of a given witness may be determinative of guilt or innocence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935).  This is true whether the nondisclosure was intentional or through negligence. *Giglio v. United States*, 405 U.S. 150, 154 (1972).  In order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, a petitioner must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false.  *Napue v. Illinois*, 360 U.S. at 271.  The Supreme Court has also stated that a new trial is dictated only when the false testimony could, in any reasonable likelihood, have affected the judgment of the jury. *Id*., *See Knox v. Johnson*, 224 F.3d 470, 478 (5th Cir. 2000) (holding that any alleged perjured testimony by witness was not material because, in part, the witness' relevant testimony was corroborated by other witnesses' testimony).

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the suppression by the State of evidence favorable to the accused and material to either guilt or punishment violates a defendant's due process rights under the federal constitutional.   Under *Brady*, the prosecution has a duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985). Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.   A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678; *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998).

*Analysis*

In his first ground for relief, petitioner alleges the State knowingly elicited false testimony when District Attorney John Mann questioned Reed about portions of her written statement taken out of context, thus creating a false impression.   Particularly, petitioner alleges this occurred when, in response to his questions, Reed falsely testified that petitioner's story about kicking Twila to death was the only one he made her swear to keep secret.   In his second ground for relief, petitioner alleges the State created false evidence because police officers threatened and intimidated Reed, thereby causing her to lie at trial about what occurred in her home on January 1, 1994.   In his third ground for relief, petitioner alleges the State violated *Brady* because it failed to disclose to the defense the threats made by the police to Reed.

For the reasons set forth below, petitioner is not entitled to federal habeas corpus relief. First, it has not been shown that Andrea Reed's trial testimony was perjured or was false. Second, it has not been shown that Andrea Reed was threatened or coerced by state authorities.

1. *Napue* claim

 With regard to petitioner's first ground for relief, petitioner alleges the State presented testimony at trial from Reed that was placed in a "false light."  Specifically, petitioner asserts District Attorney Mann questioned Reed in such a way that it falsely appeared petitioner had told Reed three distinct stories about what had happened.  Petitioner contends the stories were not distinct, but, instead, the stories about petitioner saying he found Twila in bed with her ex-husband, about a person named Ricky Palmer, and about killing Twila, were all one story told by petitioner. (Petition at 24).  Petitioner further alleges prosecutor John Mann elicited false testimony from Reed when she testified petitioner only asked her to swear not to reveal the story he told about kicking Twila to death, when the truth was that he (petitioner) made her swear not to tell anyone about all of the stories he told Reed on January 1, 1994. (Petition at 25-6).  Petitioner argues this false testimony was material to his conviction because Mann argued in his closing summation that petitioner told Reed that he was telling the truth and swore her to secrecy before he told her that he thought he had killed Twila. (R. 30:1547-48).

 The portion of Andrea Reed's statement to the police involving the various stories, in relevant part, reads as follows:

> All the time I am helping him with his hand, about three hours, he is rambling, telling me different stories about what happened to him.  The first story he told was that he and Twila were home when a Mexican, I think he said dude, that Twila knows, came to the front door and when he went to the door, the Mexican pulled a knife on him, so Hank pulled his knife, then he said again that the Mexican pulled a knife on him and was trying to cut his face so he put his arms and hands up to protect his face and that's how he got cut.  Then he said he didn't know where these guys, one at the front and one at the back, came from.  When he first started telling me the story there was only one guy . . . .

. . . . Then he'd tell me that he knew I was the only true friend
he'd ever had and that he wasn't going to lie to me and he told me
he would tell me the truth about what happened.  He told me that
he had come home from work and found Twila in bed with her ex-
husband.  He said he punched him, the ex-husband, in the nose
then kicked him out of the house.  Then he told me I had to swear
to God that I would not tell anyone what he was going to tell me.  I
told him he knew better than that, that I don't talk out of school.
That's when he said he thought he had killed Twila.  I asked him
how and he said that he had tried to kick her to death . . . .

. . . . He cry and make me promise not to tell nobody and he'd tell
me things that were real important to him from things like he loved
me to he killed Twila and each time he'd say something he'd make
me promise not to tell.  He told me that he was going to tell me the
truth about what happened and I told him I could tell he was lying
and he asked me how I could tell he was lying and I told him
because his lips were moving.  He then said that Ricky Palmer had
broken into the house.  That's all he said about Ricky, nothing
about what happened after Ricky broke into the house . . . .

. . . . One of the stories he told was that Twila had some cocaine
dealers looking for her and they wanted her real bad.  He also told
me three or four times that a boom had hit him in the chest and x-
rays showed he had spots on his lungs and didn't have much to live
for anyway.

(E.H., Resp. ex. #2).

On direct examination at trial, D.A. Mann elicited testimony from Reed that the first

story petitioner told her was about a Mexican who came to the house. (R. 26:495-96).  Mann

then asked her about the next story petitioner told, and she testified that it was about two

Mexicans who came to the house, one at the front door and one at the back door. (R. 26:497-99).

Mann then asked Reed what petitioner said next, and she testified that "he kept telling me he

would tell me the real story about what happened to his hand." (R. 26:499).  Mann later

specifically asked Reed if petitioner said anything about Twila and her ex-husband.  Reed

responded that petitioner told him that he had caught them in bed, had hit the ex-husband in the

mouth, and kicked him out the front door.  Mann then immediately asked if petitioner ever gave

another version of what happened, and Reed responded that he started a story about Ricky

Palmer, but never finished it. (R. 26:500).  Mann then asked her what petitioner had said "had

happened there."  Reed responded that petitioner told her that he thought he had killed Twila,

after he told her she had to swear not to tell anyone. (R. 26:501).  On re-direct, after defense

counsel Kenneth Fields elicited testimony from Reed that petitioner had told her a number of

times in connection with a number of stories that he was going to tell her the truth, District

Attorney Mann asked Reed out of all the stories petitioner had told her that night, which story

was it that petitioner made her (Reed) "swear to God not to reveal."  Reed responded that it was

the story where he said that he thought he had kicked Twila to death.  District Attorney Mann

then asked Reed whether petitioner made her swear not to reveal any of the others or just the

one.  Ms. Reed's response was it was "[j]ust that one."  (R. 26:526-27, 528).

Petitioner argues District Attorney Mann knowingly elicited false testimony because his

method of questioning Reed made it appear petitioner's statement that he thought he had kicked

Twila to death was a separate story from the story about the ex-husband and the Ricky Palmer

story, thus giving greater credence to the story about kicking her to death.  Petitioner further

argues District Attorney Mann elicited false testimony when Reed testified that the only story

petitioner made her swear not to tell anyone was the story about killing Twila.  A review of her

written statement and her trial testimony, however, reveals that Mann's questioning of Reed

followed her written statement very closely.  During her trial testimony, Reed testified regarding

the ex-husband, Ricky Palmer, and the "kicking Twila to death" stories one right after the other.

Moreover, petitioner has not presented any evidence that the District Attorney had any reason to believe that the sequence of events as testified by Reed at trial was any less truthful than the events she outlined in her written statement.

Petitioner next alleges District Attorney Mann presented false testimony when he allowed Reed to testify that petitioner only told her to swear not to tell anyone that he thought he had killed Twila, when Reed had stated later in her written statement that petitioner asked her to "promise" not to tell anyone the other stories.

In considering this claim, it is noted that the parties treat the term "promise not to tell" and "swear not to tell," synonymously.  The semantical distinction between "promise" and "swear" may be slight or perhaps even may be without distinction to some.  On the other hand, to others, there is a definite distinction between swearing and promising, and this distinction is magnified when the phrase "swear to God" is used.  Consequently, while Ms. Reed, at different times during her four (4) page typewritten statement to the police may have stated petitioner would "cry and make me promise not to tell nobody and he'd tell me things that were real important to him from things like he loved me to he killed Twila and each time he's say something he make me promise not to tell," there was only one time and only one place in her entire four-page statement, that Ms. Reed ever said petitioner made her "swear to God" not to tell what he was going to say and that was when petitioner told Ms. Reed he thought he had killed Twila by kicking her to death.

Petitioner has not established the District Attorney knew or believed the testimony Ms. Reed gave at trial was false.  *See Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002) (holding that the fact that false or perjured testimony is challenged by other evidence presented at trial or

is inconsistent with prior statements does not establish the prosecution knew or believed that testimony to be false).  Nor has petitioner shown that the District Attorney presented Ms. Reed's testimony out of context or in a false light.  Accordingly, petitioner has failed to establish the prosecutor knowingly presented false testimony at trial.  Petitioner's first ground for relief is without merit and should be denied.

2.  Threats and/or coercion claim

With regard to petitioner's second ground for relief, in an apparent attempt to avoid the requirement under *Napue* that the State must **know** that testimony is false, petitioner alleges his due process rights were violated because police officers threatened Reed and that these threats caused her to lie to authorities and testify falsely on a variety of subjects.  Petitioner also alleges that, even if the threats made against Reed "were truthful and lawful at the time they were made," and even if the police officers did not intend to cause Reed to commit perjury, if the threats gave her an "undisclosed motive to lie," they created false evidence and petitioner is entitled to relief.

Petitioner contends that, because police officers told Reed she could be arrested as an accomplice or for harboring a fugitive, because she was told her daughter would be subpoenaed to testify if she did not testify as expected, and because she was not allowed to leave the hotel during the trial and was given a script of her testimony, that Reed was motivated to lie at trial, minimizing the assistance she gave petitioner that night and testifying falsely that he threatened to kill her.  As support for his claim that he is entitled to relief, petitioner cites to two cases in his amended petition: *United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976), and *Ex parte Brandley*, 781 S.W.2d 886 (Tex. Crim. App. 1989).  In *Sutton*, the Fourth Circuit reversed a conviction

where the prosecutor had assured the jury in his closing statement that no-one had threatened the

State's main witness, when in actuality an FBI agent had threatened to prosecute him, although

he never intended to do so.  The court held the government's failure to disclose the threat,

coupled with the prosecutor's assurance that no-one had threatened the witness, violated Sutton's

due process rights, even though the threat itself was not an illegal act. *Id*. at 1242-43.  In

*Brandley*, the Texas Court of Criminal Appeals reversed Brandley's capital murder conviction,

holding his due process rights were violated because an investigator physically threatened a

witness and had him sign a written statement when he could not read or write, and the defense

was not told another person had confessed to the crime or that two other men were seen near the

scene of the crime acting in a suspicious manner. *Id*. at 893-95.  In his post-hearing brief,

petitioner also cites to two Second Circuit cases, *United States v. Wallach*, 935 F.2d 445, 456

(2nd Cir. 1991), and *Sanders v. Sullivan*, 900 F.2d 601, 607 (2nd Cir. 1990).  In these cases, that

court held that, even if the prosecution does not know a witness lied at trial, it is a constitutional

violation if the testimony was material and, but for the perjured testimony, the defendant would

most likely not have been convicted.  In *Sanders*, however, the court acknowledged that many

other circuits, including the Fifth, do not recognize a constitutional violation based solely on

perjured testimony, unless the State knew the testimony was false. *Sanders*, 900 F2d at 605.  *See*

*Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir. 2000).

Even if this Court was bound by the decisions in these cases, which it is not, none of

these cases support petitioner's contention that he is entitled to relief if, in fact, Andrea Reed had

lied at trial, even if the State did not know that the testimony was false.  First, no prosecutor at

petitioner's trial assured the jury that Reed had not lied, and there were numerous witnesses and

pieces of evidence that supported the State's case against petitioner other than Reed. Consequently, while Reed's testimony was important to the state's case, it was not so critical that the petitioner could not have been convicted without it.  This is particularly so since much of Reed's testimony was not recanted.  For example, it is not in dispute that petitioner traveled the 3 1/2 to 4 blocks to Reed's house, nor is it challenged that petitioner's shirt and pants were blood stained.  Petitioner does not challenge that he made the statements attributed to him by Reed, but only challenges the context in which they were made, and whether the statement containing several stories was one continuous statement or several short statements.  Next, there is no evidence Reed was physically threatened or forced to sign a statement she could not read.

In any event, the evidence presented at the evidentiary hearing and the facts before this Court simply do not support petitioner's allegation that Reed lied at trial or was threatened by the police.  First, while Reed testified at the hearing that she lied in her written statement and at trial about a number of things, her  recantation was directly contradicted by a number of disinterested witnesses.  In particular, Gerry Douglas testified at the hearing that, contrary to her recantation, she told him, within a matter of hours after petitioner had been in her home, that petitioner had come barging into her house, on his own accord, had run into the back bedroom, and had threatened her, telling her that if she told anyone where he was hiding that he would kill her and her kids.  Connie Neighbors testified Reed told her that petitioner had told her he thought he killed Twila and the boys, that he wanted her to sew up his hand, and he had threatened her and her children if she called anyone.  Finally, in her statement, Jessica Reed testified petitioner entered the house on his own and, apparently, entered and exited the bathroom on his own. Thus, Douglas' and Neighbors' testimony at the hearing, as well as Jessica Reed's own

statement given hours after the event, are in direct opposition to Reed's new and/or recanted testimony that she had to help petitioner perform tasks in her home and that petitioner never threatened her life. The Fifth Circuit has recognized that recanting witnesses should be viewed with suspicion by the courts. *See Wilkerson v. Cain*, 233 F.3d 886, 893 (5th Cir. 2000). Such natural suspicion, coupled with the significant testimony in opposition to Reed's recantation, renders petitioner's assertion that Reed testified falsely at trial with little evidentiary support.

In addition to the testimony set forth above which directly contradicts Reed's recanted testimony, several witnesses also testified in opposition to Reed's claims of threats and intimidation by the police. Both Gerhardt and Lockridge denied ever threatening Reed with prosecution, and Lockridge testified that, when she took Reed's written statement, she did not threaten or even try to persuade Reed regarding what Reed said in her written statement. Gerhardt also denied ever telling Reed that her daughter would be subpoenaed, and Gerhardt explained she never required Reed to stay in the same hotel room with her in Fort Worth. At the hearing, District Attorney John Mann testified he never instructed Reed on how she should testify, never personally interviewed her before she took the stand, and that, while in Fort Worth, all of the people staying at the hotel were encouraged to exercise caution and not to go out after dark. Tracey Jennings testified that she did not show Reed a prepared script for her testimony, and that she remembered that everyone at the hotel was cautioned about being careful and not going anywhere alone or at night.

Consequently, the undersigned finds Andrea Reed's testimony at the evidentiary hearing on the issue of whether she was threatened or coerced and on the issue of whether her written statement to the police and her trial testimony were false not to be credible. The evidence before

this Court is that Reed for reasons of personal remorse or for whatever reason recanted her statement to the police and recanted her trial testimony, but such recantation is not truthful. Further, assuming for purposes of argument that if, in fact, any of Ms. Reed's statement of January 1, 1994, or her trial testimony was slanted, it was not because of any actual threats from authorities, but because subjectively she did not want the police to believe she was involved in any manner with the murders, including assisting petitioner afterwards.  Reed's subjective belief and fear about potential liability, however, is not a basis for habeas relief.  As Respondent noted, the Supreme Court has held that coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause of the Fourteenth Amendment, and a confession cannot be deemed involuntary and thus inadmissible at trial pursuant based solely on a suspect's mental condition. *Colorado v. Connelly*, 479 U.S. 157, 163-5 (1986).  While *Connelly* involved a statement taken from a suspect, rather than a statement or testimony from a witness, the comparison is appropriate.  Petitioner asks this Court to grant relief because one of the State's witnesses *may* have made some incorrect statements in her written statement and to the police, statements the State had no reason to believe were false, not because she was actually threatened by authorities, but because she subjectively believed she might be in legal trouble and/or wanted to keep her daughter from having to testify.  Ms. Reed's own mental condition when she made her written statement and testified at trial to things she now states years later were incorrect is not a basis for federal habeas relief, especially where much of Reed's questioned trial testimony has, in fact, been corroborated by others.  Petitioner is not entitled to relief on this ground, and it is recommended that it be denied.

3.  *Brady* claim

        In his third ground for relief, petitioner contends the State violated *Brady v. Maryland*
because the prosecution did not disclose to defense counsel that police officers had threatened to
arrest Reed and had threatened to subpoena her daughter to testify at trial.  Petitioner asserts this
information was favorable to him because it served as a motive for Reed to lie about the time she
spent with petitioner on January 1, 1994.  Petitioner also asserts this information is material
because there is a reasonable probability that, had Reed not lied about his ability to do certain
things that day at her home, he would not have been convicted.

        As noted earlier, petitioner has failed to present persuasive evidence that Reed was
threatened by police officers.  The officers in question specifically denied ever threatening to
charge Reed with any crime or threatening to subpoena her daughter if Reed did not testify in a
certain way.  Further, some of Reed's other testimony at the evidentiary hearing was
contradicted by other witnesses at the hearing, and her testimony on these issues is not credible.
Assuming, however, for purposes of argument, that Reed did interpret statements from the police
as threats and then in her own mind determined she should lie in her written statement and under
oath at trial in order to minimize her involvement in the case, petitioner has failed to establish
that any of these alleged lies are material.  While petitioner contends that, without Reed's false
testimony, the State would have been unable to contradict the toxicologist Dr. William Lowry's
testimony that, in his opinion, petitioner was incapable physically and mentally of committing
the murders due to his intoxication, there remains sufficient unrecanted testimony establishing
petitioner's abilities at the time of the murders which contradict Dr. Lowry.

        Specifically, it is undisputed that petitioner walked the three and a half blocks to Reed's

house shortly after the murders were committed, in the dark. (R. 26:506).  Moreover, Reed has

not recanted her trial testimony that petitioner told her he wanted her to stitch up his hand  and

that he instructed her not to call anyone, including Twila. (R. 26:493-95, 500).  And, in his

interview with the authorities on January 4, 1994, that was admitted into evidence at trial,

petitioner admits that he awakened that night, realized his vodka bottle was gone, and went to

Andrea's to see if she could fix his hand. (State's Ex. 59-A at 2, 4).  In this same statement,

petitioner told the authorities that they would be amazed what he did "mind-wise" when he was

drunk, as he can read and do math and he even defended himself successfully in traffic court

once, although he does not remember things afterwards. (State's Ex. 59-A at 17-8).  All of this

evidence contradicted Dr. Lowry's testimony that most people at the level of intoxication

petitioner was at midnight would have been comatose or asleep and that, in any event, between

12:00 a.m. and 3:30 a.m., petitioner would have been in a stupor, with impaired consciousness,

general apathy, and an inability to stand or walk. (R. 29:1369).  Indeed, Dr. Lowry

acknowledged on cross-examination at trial that he was surprised petitioner located Reed's house

at midnight and that he asked Reed to clean and sew up his hand. (R. 30:1466, 1470).

Accordingly, the evidence before this Court is that Reed's recanted testimony regarding

petitioner's abilities shortly after the murders occurred is not material to the degree that, had

defense counsel known that Reed was allegedly pressured into giving this testimony, there is a

reasonable probability petitioner would have not been convicted.  Petitioner's third ground for

relief is without merit, and it is recommended that it be denied.

B.
Ineffective Assistance of Counsel–Trial Stage

Ground 4

In his fourth ground for relief, petitioner alleges he received ineffective assistance of counsel at trial in violation of the Sixth Amendment.  Specifically, petitioner asserts his trial counsel were ineffective for: 1) failing to effectively cross-examine State's witness Andrea Reed; 2) failing to offer an effective argument regarding the State's blood stain evidence; 3) failing to present evidence that petitioner is allergic to codeine; 4) failing to discover and present additional evidence of an alternate suspect; and 5) failing to have additional scientific tests performed.

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel.  *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980).  In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. *Id*. at 687.  Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689.  To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the out-come." *Id.* at 694.  In the context of ineffective assistance of trial counsel, the prejudice

component of the *Strickland* test "focuses on the question whether counsel's deficient per-formance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted).   Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel.   *Strickland*, 466 U.S. at 695-96.   The Court also noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Petitioner has presented the Court with an excellent post-hearing brief which throughly addresses all of the issues raised heard at the evidentiary hearing, and the brief is particularly good in its analysis and presentation of petitioner's claims of ineffective assistance of counsel. In deciding the question of whether petitioner was deprived of the effective assistance of counsel, the Court must not only look to the specific deficiencies identified by petitioner and, as petitioner argues, the cumulative effect of those alleged deficiencies, but the Court must also examine the entire trial court record which provides a very definite picture of the overall effectiveness of counsel during the trial and ensures that particular allegations of ineffective assistance will not be taken out of context or unduly emphasized.   As set forth above, in order for petitioner to prevail on an ineffective assistance of counsel claim, he must not only establish deficient performance, but must show prejudice.   The prejudice prong cannot be intelligently addressed unless the alleged deficient performance is viewed in the context of the entire trial and considered in light of all of the evidence presented.

This Court's review of the trial record reflects that both Mr. Comer and Mr. Fields provided petitioner with quality representation.  The trial was hard-fought and trial counsel zealously presented their theory of the case as well as attacking the State's case and subjecting the State's presentation of evidence to proper adversarial challenge.  The witnesses were effectively cross-examined and proper objections were made to the State's evidence.  While the errors petitioner has identified are areas where, in hindsight, it can be argued that counsel should or should not have chosen a particular course of action, those errors simply do not rise above the level of the occasional mistake one would expect to occur infrequently in a trial which cannot be error free.  This is definitely the case with respect to petitioner's allegations of failing to effectively cross-examine Andrea Reed, failing to effectively argue the State's blood stain evidence, and failing to discover and present additional evidence of an alternate suspect.  The failure to provide their expert with evidence of petitioner's claim to be allergic to codeine presents a stronger claim, but it is still one which still does not rise to the level of deficient performance.  The failure to have additional scientific tests performed has been shown to have been a reasonable trial strategy decision.  With that overview, petitioner's specific claims of ineffective assistance of counsel are addressed below.

1.  Failure to effectively cross-examine State's witness Andrea Reed

Petitioner first contends co-trial counsel Kenneth Fields was ineffective in his cross-examination of Andrea Reed.  He asserts Mr. Fields should have impeached Reed's testimony with her prior written statement.  Petitioner contends that, had Mr. Fields done so, he could have highlighted the fact that, in her written statement, Reed stated petitioner had her promise not to tell several of the stories he told her while in her home.  Petitioner argues he was prejudiced by

this failure because the jury was left with the impression that petitioner only had Reed promise not to tell the story about killing Twila Busby by kicking her to death.

On cross-examination, defense counsel Fields questioned Reed about the drug and alcohol abuse problems petitioner and Twila had, obtained testimony from Reed that in her experience as a recovering addict she had seen people who lost touch with reality through a combination of alcohol and drug abuse, and that in her opinion petitioner was on both drugs and alcohol on January 1, 1994. (R. 26:508-15).  Mr. Fields also elicited testimony that, when petitioner arrived at the door of her residence, there was gunfire from neighbors who were celebrating being New Year's, that petitioner told her that people were shooting at him, and stated he was shot in various parts of his body, although his only injury was a cut to his hand. (R. 26:516-20).  Reed acknowledged on cross-examination that petitioner talked to her about things that happened many years ago and about things that never happened and that half the time petitioner did not even know that he was talking to her, as he would call her other names. (R. 26:520-23).  Ms. Reed also testified on cross-examination that petitioner told her a number of times that he would tell her the truth and that he would say this each time before he began a different story. (R. 26:526-27, 532).  Mr. Fields did not elicit specific testimony from Reed that petitioner commented several times that she needed to promise not to tell anybody about various stories, a statement contained in her written statement, although he apparently began to question her on this subject at one point. (R. 26:532).  Although Mr. Fields failed to specifically question Andrea Reed about being asked to swear not to tell all of the stories petitioner told her and not just the story about kicking Twila Busby to death, defense counsel did place into evidence,

before the jury, the fact that Ms. Reed was asked by petitioner more than once to swear not to tell any of the stories.  This evidence was admitted during the questioning of Dr. William Lowry. (R. 30:1514).

As noted earlier, prosecutor John Mann, on re-direct examination, elicited testimony from Reed that petitioner made her "swear to God" not to tell anyone about only one story, that being the story that he kicked Twila Busby and thought he killed her.  Further, while District Attorney Mann mentioned this testimony in his closing statement, (R. 30:1548), Mr. Fields, in his closing statement, responded that, according to Reed's testimony, petitioner made Reed promise not to tell numerous times and that her testimony and written statement reflect that the story emphasized by Mann was not the last one told by petitioner. (R. 30:1599-1600).

Petitioner's contention is that, if Mr. Fields had specifically questioned Reed on the issue, she would have acknowledged that petitioner had her promise not to tell numerous stories that were obviously not true and this would have taken away the prosecutor's argument that petitioner emphasized to Reed the story that he thought he had killed Twila.  Petitioner's contention is without merit.  The cross-examination of Reed, in its entirety, reflects that under questioning from Mr. Fields, Reed acknowledged that petitioner told her every story was the truth, that to her knowledgeable eye petitioner was drunk and on alcohol and drugs when he arrived at her house, that he told many stories from the past, some of which she knew were not true, that he said that he had been shot, when he clearly had not, and that he did not seem to know who she was much of the time.  Furthermore, Mr. Fields, through Dr. Lowry and in his closing statement did respond to the State's argument by stating that the story about kicking Twila to death was not emphasized by petitioner over the other stories.  Thus, the record before

this Court reflects that defense counsel adequately elicited testimony from Reed that most of what petitioner told her was not true, even though petitioner insisted that it was, and that he appeared to be confused as to what had occurred and who he was talking to.  It is the opinion of the undersigned that petitioner has not shown that Mr. Fields' cross-examination of Ms. Reed was deficient so as to constitute ineffective assistance of counsel.  This determination is made notwithstanding the fact that Mr. Fields, in hindsight, feels he might have been able to have done a more effective cross-examination.  Very rarely, if ever, is there a lawyer who does not feel, after reflection and with the advantage of hindsight, that any cross-examination could not have been more effective.  The fact that a cross-examination could be improved upon or could have been more effective is not an indication that the trial cross-examination as a whole was deficient or that counsel was ineffective.

Consequently, petitioner is not entitled to relief under this ground because petitioner has not met the *Strickland* standard to show deficient performance.  Further, even if deficient performance is assumed, he has not shown any prejudice to have resulted from the alleged deficient performance.  There is no reasonable probability the jury would have not convicted petitioner even if Mr. Fields had specifically elicited testimony from Ms. Reed that petitioner had her promise not to tell every story he told her.  This lack of prejudice is further demonstrated by the other evidence supporting the conviction as well as the fact that the omitted testimony petitioner complains about was later elicited from Dr. Lowry.

2.  Failure to offer an effective argument regarding the State's blood stain evidence

Petitioner next contends trial counsel were ineffective in making their closing statements at the guilt phase of the trial.  Specifically, petitioner asserts trial counsel were ineffective for not

pointing to a statement contained in police officer Morse Burroughs' blood spatter report which undermined the state's theory of the case.  In his post-hearing brief, petitioner also asserts trial counsel were ineffective for failing to show this report to their toxicology expert, Dr. William Lowry, and thereby use this statement as part of their defense.

In particular, petitioner asserts trial counsel should have argued in closing statements that a statement in Officer Burroughs' report that there were blood stains on Elwin Caler's shorts constituted evidence that undermined the State's theory that Elwin Caler was killed in his bedroom.  Petitioner argues instead this shows he (Elwin Caler) was in the same room as his mother when she was being murdered.  Petitioner contends if Dr. William Lowry, the defense toxicologist, been shown this report, it would have bolstered his testimony because he would have testified that petitioner would not have had the capacity to kill Twila while presumably fending off her son.

*Applicable Facts*

At petitioner's trial, police officer Morse Burroughs testified Elwin Caler had blood spots on his underwear when he was discovered at the neighbor's house that were inconsistent with the type of wounds he had.  Burroughs further testified these blood spots were round in shape, indicating the point of origin was ninety degrees from the surface area of the shorts. (R. 24:159).  Burroughs wrote a report in which he detailed this information.  This report was not admitted at trial, but most of the report was read into evidence at trial, including the portion where, when describing a photograph of Elwin Caler, Burroughs stated that:

> Also noted was medium velocity impact spatter on the front of the victim's underwear, stomach, left side and left forearm.  The spatters on the right forearm indicate that they originated somewhere in front of the victim's hand.

The spatters on the front of the victim's undershorts appear to be nearly circular in shape with some indication they were traveling right to left on impact.

There are two nearly circular shaped spatter on the left side of the victim which indicate they originated somewhere to the victim's left side and were in the immediate vicinity of the victim Twila Busby at the time of her assault.

(R. 24:216-17).  At the evidentiary hearing, the final relevant portion of this report was again read into the record, which clarified that the report stated that "these patterns would indicate this victim was present in the immediate vicinity of victim Twila Busby at the time of her assault." (E.H. I:103).  At the evidentiary hearing, defense counsel Mr. Comer and Mr. Fields testified they had no recollection of the report or of showing the report to Dr. Lowry. (E.H. I:102-4,  108, 213-15).  Dr. Lowry testified he was not shown this report prior to trial and, had he been, his opinion that petitioner could not have committed the murders would have been bolstered because petitioner, in his inebriated state, could not have beaten Twila to death while in the same room with a young man who was over 6' 2" or 6' 3" and weighed 230 pounds and then successfully change his weapon from a stick to a knife and stab Elwin. (E.H. II:308-09, 326, 369).  Dr. Lowry acknowledged on cross-examination that this scenario assumes that the blood on Elwin is Twila's blood, and  that petitioner had to finish killing Twila before killing Elwin. He also acknowledged that he had not been informed that Elwin had muscular dystrophy. (E.H. II:367-70).

In his opening statement to the jury, District Attorney Mann made no mention of the order in which he believed the murders occurred.  In his initial closing statement, the only mention Mr. Mann made of the order in which the murders occurred was when he argued that petitioner first killed Twila out of rage because she had gone to the party without him and taken his vodka.  Mr. Mann then argued that, because he killed Twila, he had to kill the others, so he

stabbed Randy Busby, cutting his hand when the knife hit his (Randy Busby's) shoulder blade, and Elwin Caler ran out the front of the house. (R. 30:1556-57).  In his rebuttal argument and after defense counsel had completed their closing, Mr. Mann argued at one point that a logical deduction from the evidence was that, after petitioner killed Twila, he went into the boys' bedroom, and Elwin came out of the bottom bunk at some point, causing petitioner's bloody handprint to be found eighteen inches from the floor. (R. 30:16-7-08).

*Analysis*

Petitioner argues his trial counsel were ineffective in their closing statements.  In considering whether a closing statement constituted ineffective assistance of counsel, an appellate court should look at the closing statements in their entirety. *Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997).  In the instant case, the only mention of any particular theory regarding  the order, and location, of the two boys when they were killed was made by District Attorney Mann on his final closing statement, after defense counsel had completed their closing statements.  Defense counsel cannot be faulted for failing to respond to an argument which was not made until after their final argument had been completed.  Further, the argument by the District Attorney was not objectionable.

As to petitioner's alternative argument that trial counsel should have utilized the Burroughs' evidence of blood spatter on Elwin Caler's undershorts to present evidence, through Dr. Lowry, that petitioner was not capable of killing Elwin if he was located in the same room as Twila, and assuming counsel were deficient in failing to provide this report to Lowry, petitioner

cannot establish prejudice.[6]  Dr. Lowry's opinion at trial was that petitioner was too incapacitated to have traveled to different rooms to kill the victims. (R. 30:1504-05).  His opinion at the evidentiary hearing was that petitioner was too incapacitated to kill two people located in the same room.  However, as Lowry acknowledged at trial and at the hearing, in his opinion petitioner should not have been able to do most of the activity he did that night. (E.H. II:327-32).  Thus, regardless of Elwin's location in the house when he was stabbed, Dr. Lowry did not believe petitioner capable of the murders.

Further, there are far too many unknown factors.  First, one must assume Officer Burroughs was correct in his report and that the blood on Elwin Caler's undershorts was Twila Busby's blood.  Assuming that to be true, the medical examiner testified that, in her opinion, Twila Busby would have been unconscious from strangulation before she was beaten. (R. 28:1187).  If this is the evidence, then petitioner would not have had two live, active victims in the same room.  Twila Busby would have been unconscious or already dead when Elwin Caler appeared.  Further, this type testimony would have opened the door for the State to highlight the fact that Twila Busby was already unconscious when petitioner was beating her with the ax handle and continued to beat her up inflicting up to fourteen blows, and which beating would have been witnessed by her son.  There is also testimony at trial from Twila's mother that Elwin Caler was "slow" and had diabetes and muscular dystrophy, such that he could not work. (R. 27:770-71).  Thus, even given his size, this is evidence that Elwin's ability to fight back or escape might have been lower than persons his size without disabilities.  Such evidence would

---

[6] For purposes of analyzing this claim of ineffective assistance of counsel the Court will assume Dr. Lowry was not provided with Office Burroughs blood spatter report.  Indeed, Dr. Lowry so testified.  However, Dr. Lowry's testimony at the trial indicated he was not clear as to what evidence had been provided to him, and at one point during the evidentiary hearing while being cross-examined, Dr. Lowry indicated he did see or that he had stated at trial that he had seen the Burroughs' report.  As stated above, the Court will consider in analyzing this claim that counsel failed to provide Lowry with this particular blood spatter report.

have potentially undercut Dr. Lowry's opinion that petitioner could not have confronted two victims in the same room.  Consequently, petitioner has failed to establish he was prejudiced by defense counsel's failure to make this argument.

### 3.  Failure to present evidence that petitioner is allergic to codeine

Petitioner next alleges his trial counsel were ineffective in failing to present evidence that petitioner is allergic to codeine.  Petitioner argues counsel had information from various sources that petitioner is allergic to codeine and, had this evidence been shown to Dr. Lowry and presented at trial, it would have bolstered the defense's argument that petitioner was too incapacitated to have committed the murders.

*Applicable Facts*

At the evidentiary hearing, evidence was presented that petitioner informed Mr. Harold Comer in a letter that he was allergic to codeine and that, in various medical records which defense counsel had in their possession, petitioner self-reported in various hospital visits that he was allergic to codeine.  Defense counsel acknowledged they did not recall seeing information about a potential codeine allergy prior to trial or not noting it as being important to the case. (E.H. I:115, 144, 215).

Dr. Lowry testified at the hearing that he was never shown any records reflecting petitioner might be allergic to codeine, nor was he told this information. (E.H. II:303).  Dr. Lowry testified the symptoms of an allergy to codeine are rash, swelling, a lowering of blood pressure, which could lead to dizziness or sleepiness, bronchial restriction, a possible anaphylactic response, but he further stated that persons would not necessarily display the same symptoms. (E.H. II:300-01, 305).  Dr. Lowry testified the information regarding a codeine

allergy would have bolstered his trial testimony because a codeine allergy would have enhanced petitioner's disability or incapacity argument, or if petitioner incorrectly believed that he was allergic to codeine, he would have avoided it and thus would not have developed a tolerance to it. (E.H. II:306).  On cross-examination, Dr. Lowry acknowledged it was possible petitioner took the codeine after midnight, thus making it more possible that he was functioning and mobile at midnight because he would have only had alcohol in his system at that point. (E.H. II:350, 353). Dr. Lowry also acknowledged at the hearing that it was his opinion at trial, and his opinion at the time of the evidentiary hearing, that petitioner should not have been able to walk to Andrea Reed's house, should not have been able to move around in her house unassisted, have a conversation, have a purpose in mind that was directing his movements, know about things that happened while he was passed out on the couch, such as his vodka being gone or Twila Busby having had gone to a party, or be able to get up from the couch, confront the "real" killer and still arrive at Reed's house within the half-hour between Twila Busby arriving at her house and midnight. (E.H. II:327-32).

Michael Chamales, M.D., testified for Respondent at the hearing.  Dr. Chamales is an emergency room medical director and was an emergency room doctor who treated petitioner in October of 1993.  Dr. Chamales testified he remembered treating petitioner in 1993 because it was the only time he experienced a patient being caught trying to steal syringes. (E.H. II:495-99, 501, 513).  Dr. Chamales suspected petitioner was seeking drugs in that October 1993 visit because he self-reported that he was allergic to codeine, as well as to an antihistamine and an injection similar to ibuprofen.  Chamales testified that, in his experience, drug seekers will report to the emergency rooms with injuries or complaints that cannot be verified and then report false

allergies so doctors will be directed to medications they desire. (E.H. II:500-03).  Dr. Chamales testified the allergic reaction to an opiate such as codeine would be exterior hives or, if the hives were in the stomach, nausea and vomiting, an anaphylactic reaction with a swollen throat and trouble breathing and talking, or dizziness. (E.H. II:504, 506-07).

*Analysis*

Mr. Comer testified at the evidentiary hearing that petitioner Skinner was a prolific letter writer and that while he attempted to look at and scan all of the correspondence he received from Mr. Skinner, he did not recall ever having received the letter from Mr. Skinner informing him of his allergy to codeine.  There is no evidence, however, that Mr. Skinner never queried Mr. Comer about this issue, or about whether Mr. Comer had received the letter.  Since the letter from Mr. Skinner was located in Mr. Comer's file which had been turned over to habeas counsel, it is obvious Mr. Comer did, in fact, receive the letter.  However prolific a letter writer Mr. Skinner may have been, or however difficult a client he may have been, the letter should have received some attention from Mr. Comer.  Whether he never saw the letter, whether because of the passage of time Mr. Comer has simply forgotten about the letter, or whether upon receiving it he did not, as he testified at the evidentiary hearing, place much import to it since a codeine allergy would be contradictory to the defense's position that Skinner's ingestion of alcohol and codeine on the night in question rendered him incapable of performing the murders, the issue of why the topic was not discussed with Dr. Lowry, the toxicologist, remains.  Therefore, assuming for purposes of argument, that defense counsel were ineffective in not informing Dr. Lowry that petitioner might be allergic to codeine, petitioner has failed to establish prejudice under the *Strickland* standard.

First, there is no conclusive evidence that petitioner is, in fact, allergic to codeine.  While there are several instances where he self-reported this allergy, Dr. Chamales presented compelling reasons why a drug-seeker might list a false allergy.  Indeed, petitioner's ex-wife gave testimony that petitioner was *not* allergic to codeine, but did not like to use it because it was not strong enough. (E.H. III:801-3).  Morever, a friend of petitioner's, Lori Brim, suggests she saw petitioner have an allergic reaction to codeine many years ago, but this was based on a suggestion made over the telephone by a nurse, not a diagnosis by a medical professional. (Pet. E.H. ex. #15).  Further, petitioner did not exhibit any noticeable symptoms of a codeine allergy on January 1, 1994, that could be differentiated from his general intoxicated state.  Petitioner was at Andrea Reed's house for approximately three (3) hours, and Ms. Reed testified he had no rash, no swelling, and no noticeable trouble breathing. (E.H. II:282).  Further, during the time petitioner was under arrest and being treated at the hospital on January 1, 1994, he exhibited no allergic reaction, even though his blood tested positive for codeine.  Petitioner had also reported an allergy to Toradol, but had a prescription for it filled in June of 1993.  (E.H. II:535).   If the defense had attempted to present evidence that petitioner was, in fact, allergic to codeine, the State could have countered this argument with evidence to the contrary.

Moreover, petitioner has failed to establish Dr. Lowry's opinion testimony would have been so bolstered by evidence of a potential codeine allergy that there is a reasonable probability petitioner would not have been convicted.  In particular, while Dr. Lowry testified at the hearing that, even if petitioner was not allergic to codeine, he would have had a lower tolerance to it because he would have avoided it due to a belief that he had an allergy, Lowry also

acknowledged there is no actual evidence petitioner took codeine prior to passing out on the couch, as opposed to after he awoke and after the murders occurred.  There is only evidence that petitioner had some codeine in his system when his blood was taken at 5:30 a.m. on January 1, 1994.  Thus, the evidence presented at trial supports a scenario where petitioner did not take codeine until after the murders, possibly after injuring his hand, meaning he was not incapacitated by it at the time of the murders.  Finally, while Dr. Lowry testified that evidence of a codeine allergy or petitioner's belief in such an allergy would have bolstered his opinion because petitioner would have been even further disabled by it, Lowry also acknowledged at the evidentiary hearing that it remains his opinion that a person should have not been able to do and think the things petitioner demonstrated he could do and was known to have done with the amount of alcohol and codeine Dr. Lowry assumed was in his system at midnight.  This "contradiction" indicates petitioner had a tolerance for whatever substances were in his system at midnight.  Further, Dr. Lowry's opinion as to the degree to which petitioner would have been incapacitated was contradicted by Dr. Chamales, a medical doctor.  Petitioner has not shown that, confronted with evidence of this possible codeine allergy, the jury would have discounted the other evidence of petitioner's actions at midnight, as well as other evidence of his guilt, in favor of Dr. Lowry's opinion to the degree there is a reasonable probability that petitioner would not have been convicted.  Stated differently, however qualified Dr. Lowry may be on the subject of toxicology, the facts of this case and the undisputed evidence of the acts petitioner did perform and was capable of performing, directly contradict Dr. Lowry's opinion.  Even if Dr. Lowry had supplemented his trial opinion to include an allergy to or an avoidance of codeine by petitioner Skinner, the facts remain that petitioner's actions on the night of December 31, 1993

and the early morning hours of January 1, 1994, provided the jury with direct evidence

contradictory to Dr. Lowry's opinion.

4.  Failure to discover and present additional evidence of an alternate suspect

Petitioner next contends trial counsel were ineffective for failing to discover and present

*additional* evidence of a possible alternative subject, Robert Donnell.  Petitioner asserts trial

counsel did not have a strategic reason for not presenting more evidence which might cast

suspicion on Donnell.  Petitioner asserts he was prejudiced by this failure because there is a

reasonable probability that, had additional evidence been presented casting suspicion on Robert

Donnell as the possible killer, petitioner would not have been convicted.

*Applicable Facts*

At trial, defense counsel presented testimony from Howard Mitchell's daughter, Sara

Mitchell, that Donnell was at Howard Mitchell's New Year's Eve party, was following Twila

Busby around, that Twila became agitated because he kept following her, and she (Twila Busby)

asked Howard Mitchell to take her home.  (R. 29:1276-79).  They also presented testimony from

Sherry Baker, a good friend of Twila's, that Robert Donnell sexually assaulted Baker in March

or April of 1994. (R. 29:1296-1300).  Ms. Baker further testified that Donnell was hot-tempered,

that he and Twila Busby got along "like a cat and dog," and that Donnell would get belligerent

and demanding and Twila would not want him around. (R. 29:1302).

At the evidentiary hearing, petitioner called three witnesses in support of this claim.

Debbie Ellis testified she lived next door to Robert Donnell at the time of the murders and was a

very good friend of Donnell's wife.  Ms. Ellis testified that, a couple of days after the murders,

she saw Donnell remove the carpet from inside his truck, throughly clean the inside of the truck,

and then paint the outside.  She stated this behavior was out of the ordinary for him as she never saw him clean his truck. (E.H. I:22-6).  Ellis further testified that Donnell carried a knife, that she saw him threaten someone with it, that he had a rude temper which became worse when he had been drinking, that he drank all of the time, and that his wife had told her that he had put a gun to her head and threatened to shoot her and had pushed her and grabbed her by the throat. (E.H. I:28-30, 47, 49-50).  Ellis also testified Donnell wore a tan windbreaker jacket all of the time. (E.H. I:30-1).  Ellis stated she did not know when Donnell returned from Howard Mitchell's party, that he looked normal when she saw him on January 1, 1994, that she saw the police tell him that his family members had been murdered and he said "okay" and showed no emotion (E.H. I:39-40, 46).  Ellis acknowledged that, when she went out to Donnell's truck when he was cleaning and painting it, she saw nothing unusual such as blood. (E.H. I:42-3). Finally, Ellis stated she told police officer Connie Lockridge this information about a month after the murders. (E.H. I:51).

James Hayes testified at the hearing that he knew both Twila Busby and Donnell, that he and Donnell "got into it" one time at Twila's house, that Donnell cut his (Hayes') shirt with a knife once, that Donnell carried a knife in his truck, and that he saw Donnell threaten some teenagers in another car with a knife once because they pulled in front of his truck.  Hayes also testified he used to date Twila Busby, that Twila would seek his help when she and Donnell were drunk and fighting at her house, and that Hayes would be the peacekeeper between the two of them by coming over and telling Donnell to leave and telling her to sit down or go to sleep. (E.H. I:55-59, 62-3, 70-1).  Hayes further testified that he did not know whether Twila was actually scared of Donnell or if she called Hayes because she craved attention, and that he

believed her calling him (Hayes) was more of an excuse to get him to bring beer over to the house. (E.H. I:59-62).  Hayes testified he was at Mitchell's party and saw Twila and Donnell arguing, that they argued when they were drunk, that Donnell left the party before Twila did because Howard Mitchell "ran him off,"and that in his presence Twila Busby stated that she did not want to go home that night. (E.H. I:60, 67-8).  Hayes also acknowledged he knew petitioner, that petitioner was violent and was drinking every time Hayes saw him, and that Donnell was at Twila's house all of the time and he did not see any serious problem between Twila and Donnell. (E.H. I:66-7).

Finally, Vickie Broadstreet testified she was Twila Busby's best friend, that Twila told her that she (Twila Busby) was having a consensual sexual relationship with Donnell, and that Twila had told her that Donnell was jealous of her having relationships with other people. Broadstreet also testified that Donnell carried a knife, although she had never seen him threaten anyone, and that Broadstreet thought Donnell was "scary" and was afraid of him, but Twila was not afraid of him. (E.H. I:73-8).

*Analysis*

The Fifth Circuit has cautioned that a reviewing court should be wary of claims that an attorney failed to present **enough** evidence of a certain type.  *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir. 2002), *citing Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000).  In the instant case, petitioner faults counsel for not calling additional witnesses to testify about Robert Donnell.  However, much of what these witnesses testified to at the evidentiary hearing was similar to evidence presented at trial, in that it was general testimony that Robert Donnell was dangerous and that he and Twila Busby had an argumentative relationship.  Counsel were not

ineffective for failing to discover and present this type of cumulative evidence.

Moreover, counsel were not ineffective for failing to discover and present the specific additional evidence petitioner contends should have been presented at trial. In particular, testimony from James Hayes and Vickie Broadstreet that Twila and Donnell were drinking companions, that neither of them believed Twila was afraid of Donnell, and that Twila had a *consensual* sexual relationship with Donnell is not necessarily testimony that would have aided defense counsel's argument that Donnell was the murderer or was a potential suspect in the crime. James Hayes' testimony that Twila told him on the night of the murders that she did not want to go home that night and that he also knew petitioner to be a violent man who drank all of the time would have hurt, rather than aided, petitioner's case. Finally, although petitioner contends Debbie Ellis' testimony that Donnell wore a tan jacket would have assisted his defense because there was a blood stained jacket at the scene, respondent argues the relevant police report indicates that the jacket was grey, *citing* Pet. E.H. ex. 79, which respondent denominates as Morse Burroughs' March 1994 Supplemental Police Report. Petitioner's Exhibit 79 was not Morse Burroughs' March 1994 Supplemental Police Report. Petitioner's Exhibit 79 was Burroughs' January 1994 Report. Burroughs' March supplement was actually petitioner's Exhibit 75, and petitioner's Exhibit 75 was not admitted into evidence at the evidentiary hearing. Burroughs' statement that the jacket found at the murder scene was grey, however, was admitted into evidence at trial when he read his report into the record. (R.24:216). Defense counsel were not ineffective for failing to present evidence that would not have been of meaningful assistance to them.

The only evidence presented by petitioner at the evidentiary hearing that might have

arguably assisted in his defense was the testimony of Debbie Ellis that she saw Donnell thoroughly clean his pick up and paint it within a couple of days after the murders.  The purported significance of this evidence is lessened by the fact that Donnell exhibited no injuries, no blood or anything else of significance was seen in his pickup, and no bloody clothes of Donnell's was ever found by Ms. Ellis or by Mr. Donnell's wife.

Counsel cannot be faulted for failing to present evidence that was not revealed by the witnesses.  *Soria v. Johnson*, 207 F.3d 232, 251 (5th Cir. 2000).  While Ellis testified she told one of the police officers this information a month after the murders, petitioner points to no police report or other document reflecting this information.[7]  Petitioner argues generally in his post-hearing brief that his defense counsel should have continued their investigations into Robert Donnell and cites two Supreme Court cases as support for this assertion.  These cases, however, held that trial counsel has a duty to investigate further where there are indications from the known evidence that further investigation would be fruitful. *Rompilla v. Beard*, 125 S.Ct. 2456 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003).  Petitioner has not made such a showing.

Lastly, petitioner has failed to establish prejudice.  When petitioner was arrested, DNA testing revealed that he had the blood of two of the victims on his clothing, he had blood on both the front and back of his clothing, he had a serious cut to his right hand and two of the victims were stabbed to death, and his bloody hand prints were found in the bedroom where one of the victims was sleeping and on the doorknobs leading out the back door.  One of the victims, Twila Busby, was last seen walking into her house shortly before midnight, petitioner was last seen

---

[7]At the hearing, Connie Lockridge, previously Connie Brainard, testified that she interviewed Vickie Broadstreet, previously Vickie Treat, and she did not tell her anything about Robert Donnell or his activities.  She further testified that she would have put such information in her police report.  She was not questioned at the hearing regarding whether she ever spoke to Debbie Ellis.  Her police report, dated January 6, 1994, reflects that Vickie Treat told her that the first time she met petitioner, he tried to tear her blouse from her in Twila's presence, but mentions nothing about Donnell. (E.H. III:782-83; Def. E.H. Ex. 17).

inside of the house, and petitioner acknowledged in his statement to the police that the axe

handle that was used to bludgeon Twila was something kept in the house for protection and other

general purposes. (State's Ex. #59-A at 14-15).  Further, although the defense argued

vehemently at trial, and presented substantial evidence to support the argument that petitioner

was too incapacitated with alcohol and drugs to have committed the murders, at approximately

the same time one of the victims staggered to a neighbor's house, petitioner arrived at a friend's

house 3 1/2 to 4 blocks away, without any shoes on, requesting assistance with his hand, and

refusing to allow to her to call anyone for help or to find out what had occurred.  Petitioner has

failed to show a reasonable probability that additional evidence that Robert Donnell was violent,

or evidence that Twila Busby had a sexual relationship with a violent man other than petitioner,

or even evidence that Donnell cleaned out his car within days of the murder, without additional

evidence linking Donnell to the murders, would have resulted in petitioner's acquittal.

5.  Failure to have additional scientific tests performed

Finally, petitioner asserts trial counsel were ineffective for failing to have DNA testing

performed on additional items seized from the murder scene which were not tested by the State.

Petitioner asserts that, had this evidence been submitted for DNA testing by defense counsel,

there is a reasonable probability he would not have been convicted.

*Applicable Facts*

At trial, the State presented evidence that DNA testing had been conducted on three

blood stains from petitioner's shirt and three stains from his pants.  Two of the stains were

consistent with Twila Busby's DNA and inconsistent with petitioner's or the boys, one was

consistent with petitioner's DNA, one was determined to be a mixture of both Twila's and Elwin

Caler's DNA, and two were consistent with Elwin's and inconsistent with petitioner's or the other two victims. (R. 28:1109-15).[8]  DNA testing was also done on a blood stain on a blanket from Randolph Busby's bed, which was determined to be Randolph's blood, as well as a hair from Randolph's cheek, one from his back, and one from the blanket.  It was determined the hair from the back was consistent with Randolph and the one from the blanket was consistent with Elwin. (R. 28:1136-37).  On cross-examination, defense counsel elicited testimony that the hair in Twila Busby 's hand, the two knives, Twila's nail clippings, blood smears from the front door, blood spots on the sidewalk, and the sexual assault kit from Twila Busby had not been submitted for DNA testing. (R. 28:1036, 1052, 1138).

At the evidentiary hearing, trial counsel, Mr. Harold Comer testified that one of the defense's tactics at trial was to attack the State for conducting an inadequate investigation and for failing to submit numerous items for DNA testing.  He explained he did not request further DNA testing on these additional items because: 1) the items that had been tested, such as the blood stains on petitioner's clothing, had been damaging to the defense's case and he did not want to run the danger of uncovering even more damaging evidence; 2) the defense blood spatter expert, Max Courtney, had submitted a report which stated that there were widespread amounts of blood stains on both sides, the front and the back of petitioner's clothing and on the lower and higher surfaces.  These findings were inconsistent with the theory that petitioner had lain comatose on the sofa during the attacks; 3) even though he could have kept the results of any additional testing secret from the prosecution, he could not have prevented the State from doing

_____

[8]The forensic scientist testified that 1 in 5.5 billion people, at that time the population on the planet, would have the same seven DNA probes that were identified in the stains as belonging to Twila, Elwin, or petitioner. (R. 28:1122-25).

additional testing of their own which could include the items he chose to have tested;[9] and 4) petitioner had made a statement to the police on January 1, 1994, that, although such statement was not going to be offered by the State at trial, stated he and Twila had fought with the stick, a statement contrary to the defense's position that he was comatose on the couch. (E.H. I:154-69, 188-89; E.H. III:759-60).  Mr. Comer further testified that defense counsel did obtain to their own DNA expert to review the State's DNA tests. (E.H. I:178-79).

A report dated August 24, 2000, regarding additional post-conviction DNA testing performed by the company GeneScreen, at the request of then District Attorney Mann, reflects nuclear DNA testing was done on numerous additional items.  These results showed that blood on a blue notebook and hairs from Twila Busby's back, left hand, and the axe handle were consistent with Twila's DNA profile.  A hair from Twila's right hand was consistent with a mixed profile of Twila and petitioner, and the DNA profile obtained from a cigarette butt was consistent with petitioner's DNA profile.  Hairs from the living room, Twila's abdomen, back bedroom door, and a cassette tape yielded no results, and the mixed genetic profile found from blood on a cassette tape and the genetic profiles from some blood-stained gauze are inconsistent with either Twila or petitioner. (Pet. Amended Pe. Ex. #26 at 2-3).  With regard to the hair from Twila's hand that yielded a mixed profile of both Twila and petitioner, a September 20, 2000, GeneScreen report reflects that Twila was included as a contributor of the blood flakes on that hair. (*Id* at 5-6).[10]

---

[9]Since the State had custody of the evidence, they would necessarily know what items were selected for defense testing.  Even if the defense had been able to keep the particular items selected for defense testing secret, the state could certainly have submitted all items for additional testing.

[10]A report dated October 2, 2000, from GeneScreen states that the mixed profile from the hair from Twila's hand is 113,000 times more likely to have originated from Twila and petitioner than Twila and a random black male, 57,500 times more likely than Twila and a random Caucasian male, and 34,100 more likely than Twila and a random Hispanic male. (Pet. Amended

A GeneScreen report dated February 6, 2001, indicates mitochondrial DNA testing done on a hair from Twila's right hand, a hair from the paper towel around the cassette tape, and two hairs from the back bedroom door indicates profiles that are consistent with Twila's profile or that of any of her maternal relatives and excludes petitioner as a contributor.  Another hair from Twila's right hand and a hair from the living room yielded inconclusive results. (Pet. Ex. #26 at 10-12).

Dr. William Shields, a DNA expert from SUNY at Syracuse,  testified for petitioner at the evidentiary hearing regarding the mitochondrial DNA testing performed by GeneScreen.  Dr. Shields testified he was not in disagreement with the conclusion reached by GeneScreen that four of the tested hairs were consistent with having been contributed by Twila or her sons and inconsistent with having been contributed by petitioner.  However, in his opinion, one of the remaining two hairs that were determined to have an "inconclusive" result by GeneScreen should have been reported as being more likely to exclude rather than include petitioner as a contributor and much more likely to exclude Twila, and any of her maternal relatives, as a contributor. (E.H. II:560-662; E.H. III:595, 612, 634-35).  Dr. Shields also testified that the FBI first used mitochondrial DNA evidence in a trial in 1996 and that, in 1995, such testing was novel. (E.H. II:419).

William Watson testified that in 2000 he was a senior forensic scientist at GeneScreen and performed the analysis on the mitochondrial DNA testing.  He further testified that he called the one hair in question an "inconclusive" result because he had determined it was a mixed sample and it would not have been appropriate to interpret a mixed sample. (E.H. III:638-

---

Pet. Ex. #27).

46,657-63 ).  He also testified that, even if Dr. Shields were correct and hair was not from

petitioner or Twila Busby, it does not prove anything about who killed Twila because  it was a

hair collected in a home, a place of high traffic. (E.H. III:644-45).

*Analysis*

Petitioner asserts trial counsel were ineffective for not having DNA testing conducted on:

1) blood stains and human hairs from a wind breaker jacket found on the living room floor by

Twila's body; 2) two knives found at the scene; 3) a cup towel with blood on it found inside a

plastic bag in the living room, along with one of the knives; 4) human hairs from Twila's body

and clutched in her hands; 5) fingernail clippings from Twila; and 5) vaginal swabs taken from

Twila at the autopsy. (Pet. Post-hearing brief at 28).  Petitioner has failed to prove defense

counsel were deficient in choosing not to have these items tested or that petitioner was

prejudiced by this decision.[11]

If trial counsel made an adequate investigation, any conscious and informed decision

counsel made based on trial tactics and strategy cannot be the basis for a claim of ineffective

assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial

with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753(5th Cir. 2003), *cert. denied*,

540 U.S.  11865 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith*

*v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).  The record before this Court reflects not only that

trial counsel throughly considered this issue and made the conscious decision not to have any

additional nuclear DNA testing performed, but the record reflects this decision was an informed

one based on trial tactics and sound strategy.  In making this decision, counsel had had their own

---

[11]Petitioner has a pending motion requesting he be allowed to conduct additional DNA testing on the issue of prejudice.

expert examine the State's DNA testing results for errors.  Defense counsel also had in their

possession a report from a blood spatter expert which contradicted the defense's argument that

petitioner was passed out and comatose on the couch.  DNA evidence which revealed that

Twila's and Elwin's blood and a mixture of the two were on petitioner's clothes, and petitioner's

own statement contradicted the defense presented at trial.  Counsel were clearly reasonable in

their apprehension that additional DNA testing could have revealed further damaging evidence.

Petitioner counters that, even if the results were damaging to the defense, the State would

have never have discovered the results.  But, this Court finds Mr. Harold Comer's testimony that

he feared that the State would decide to test whatever items he had tested to be persuasive.  In

fact, Mr. Comer stated he was relieved when the deadline passed and the State had not conducted

any additional testing.  Petitioner's next argument is that counsel were deficient because

additional testing of these items would not have harmed petitioner's case because, if his DNA

were found on any of these items, it would have been expected, because petitioner lived in the

house, had a sexual relationship with Twila, and had a cut on his hand.  However, some results

would have hurt petitioner's case or, at the very least, would not have assisted it.  In particular, if

petitioner's blood were determined to be on the handles of either of the knives, if his DNA were

found under Twila's fingernails, or if his hair were found clutched in her hand, petitioner may

have tried to argue to the jury that such was not conclusive evidence of his guilt, but such

evidence would still have been very damaging to the defense's contention that petitioner was

passed out and lying on the couch during the assaults.  This is not information that would have

been *helpful* to petitioner's case.

The major disadvantage to petitioner's case, however, would have been that he would

have lost the primary defense he presented at trial, *i.e.*, that an unknown assailant committed the murders and that there is reasonable doubt of petitioner's guilt because the State's investigation was inadequate in that the State failed to submit these additional items of evidence found at the murder scene for DNA testing, which testing would have either confirmed petitioner's guilt or would have shown the involvement of an unknown assailant. It is on this point that the Court does not agree with Dr. William Thompson's opinion that counsel was ineffective for failing to conduct additional DNA testing, and particularly his opinion that the jury would not find it significant that the State had failed to have DNA testing done on these additional items of evidence. In hindsight, of course, defense counsel's strategy of faulting the State for not adequately investigating the case and for not conducting additional DNA testing was not successful. However, this is not an infrequent defense in criminal cases, and more so in murder cases, to present a defense of reasonable doubt because the State did not throughly and adequately investigate the case. Such a tactic has been successful in the past and will in all probability meet with success in the future. Putting the State on trial so to speak, rather than petitioner, is a commonly utilized defense. Mr. Comer and Mr. Fields had extensive trial experience, unlike Dr. Thompson whose trial experience is very limited. Therefore, while the Court finds Dr. Thompson's credentials to be quite impressive, his trial experience and lack of familiarity with what juries do and do not accept, render his opinion on this issue unpersuasive.

Mr. Comer and Mr. Fields had to make their decision of whether to have additional items submitted for testing without the benefit of knowing what the results of those tests would be. Counsel were literally in somewhat of a "catch 22"position. If they chose to have additional testing done, and thereby prompted the State to do additional testing which was inculpatory, they

would surely have been criticized for that decision.  If they adopted the course of action they did chose, they are criticized as well.  Further, counsel had no realistic expectation the results of the tests would exonerate petitioner, and, in fact, were reasonable in fearing the results would incriminate him.  While petitioner, in his amended writ and in his post-hearing brief, attempts to make the argument that he at all times maintained his innocence, the testimony at the evidentiary hearing was not conclusive.  It is true that Mr. Comer did testify, without objection, that petitioner Skinner never admitted guilt and maintained his innocence, but it is also true, as evidenced by the January 4, 1994 statement of petitioner, that petitioner professed to have no recollection of the events occurring the night of the murders.  Petitioner did not testify at the evidentiary hearing and did not assert, and has not asserted, a claim of actual innocense. Consequently, counsel's decision that the potential harm to his defense of faulting the State for an inadequate investigation and for prematurely focusing their investigation on petitioner would have evaporated if additional DNA testing had been done and was detrimental to petitioner.[12] Further, Mr. Comer's fear that the District Attorney would have obtained additional DNA testing on all of the items of evidence in order to avoid any surprise, even though the prosecution would not have known the results of any defense testing, was reasonable.

Moreover, petitioner has failed to show that some of the testing which he alleges should have been done prior to trial was actually available at the time of petitioner's trial.  In particular, petitioner asserts that, had trial counsel presented evidence that one of the hairs from Twila's hand was neither her hair, nor petitioner's hair, this would have aided the defense.  Putting aside the fact that Respondent disputes this particular finding, petitioner has not established that

---

[12] Again, the additional testing which would have been detrimental would be additional testing done by the prosecution which additional testing would have been triggered by any request of the defense to have these items of evidence submitted to a defense expert for DNA testing.

mitochondrial DNA testing was widely available in 1995, a time when it was considered "novel," according to petitioner's own expert.

Furthermore, regarding the hairs that were not tested, many of those have now been tested and have been determined to have originated either from the victims themselves, a mixture of Twila and petitioner's DNA or, at best, an unknown person.  Texas Department of Public Safety criminologist Gary Stallings testified at trial that he did not attempt to test the hair in Twila's right hand because it could have come from anywhere, including the carpet on which she was found. (R. 28:1031-32).  William Watson testified at the hearing that a home is a high traffic area, and Dr. Shields acknowledged that an unknown hair on Twila's hand is not evidence that the person was involved in her murder. (E.H. III:629, 645).  James Hays testified that Robert Donnell had been in Twila Busby's house on several occasions.  (E.H. I:67)  Accordingly, petitioner cannot establish his trial counsel were ineffective for failing to request testing of items that would not have been probative.  Petitioner has failed to establish that defense counsel's decision not to request further DNA testing was not sound trial strategy or was so poorly chosen that it permeated the entire trial with obvious unfairness.  Petitioner has therefore failed to prove that his counsel were ineffective in this respect.

Petitioner has failed to meet the *Strickland* standard with respect to each of his claims of ineffective assistance of counsel.  Accordingly, it is recommended that petitioner's fourth ground for relief be denied.

C.
Conflict of Interest Claims

Grounds 5 and 6

In his fifth ground for relief, petitioner asserts he was denied his Sixth Amendment right

to effective assistance of counsel because his lead trial counsel was operating under an actual conflict of interest. Specifically, petitioner contends his lead trial counsel, Mr. Harold Comer, had an actual conflict of interest because he was the elected district attorney when petitioner was prosecuted and pled guilty to two prior felony offenses that were offered into evidence by the State at the punishment phase of the trial. In his sixth ground for relief, petitioner argues he was denied effective assistance of counsel at the motion for new trial stage of the proceedings because he continued to be represented by Harold Comer, although both Mr. Comer and petitioner requested otherwise, and Mr. Comer had an actual conflict of interest.

*Applicable Law*

In *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the Supreme Court announced the general rule with respect to conflicts of interest between attorneys and clients. In that case, a state defendant had filed a federal writ of habeas corpus alleging his trial attorney was operating under a conflict of interest because he represented Sullivan and his two co-defendants in three separate criminal trials. The Supreme Court held that the mere *possibility* of a conflict of interest is insufficient to overturn a conviction. Rather, in order for a criminal defendant to demonstrate a violation of Sixth Amendment rights that would entitle him to relief, the defendant must establish that his attorney was actively representing conflicting interests and that an actual conflict of interest adversely affected his attorney's performance. Once a criminal defendant demonstrates such a conflict, prejudice is presumed. *Id.* at 349-50. Since *Culyer* was decided, the Supreme Court has reiterated that a defendant is not entitled to a presumption that the prejudice prong of the *Strickland* standard has been met where there existed a conflict of interest on his attorney's part, unless that conflict affected the attorney's performance. *Mickens v.*

*Taylor*, 535 U.S. 162, 172-73 (2002).

In *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995), *cert. denied*, 511 U.S. 1151 (1996), the

Fifth  Circuit held that *Cuyler v. Sullivan* was only applicable in situations where an attorney was

representing multiple interests.  The Fifth Circuit further held in *Beets* that the *Cuyler* standard

for ineffective assistance of counsel did not extend to conflicts between an attorney's personal

interest and his client's interest, as those types of situations were best analyzed under the

*Strickland* standard for ineffective assistance of counsel. *Beets*, 65 F.3d at 1269-72.   The Fifth

Circuit has also held that, in order to show there has been an adverse effect, a petitioner must

show "some plausible defense strategy or tactic [that] might have been pursued but was not,

because of the conflict of interest." *Hernandez v. Johnson*, 108 F.3d 554, 560 (5th Cir. 1997),

*quoting Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir. 1996).

*Analysis*

Petitioner contends Mr. Comer had a conflict of interest because he was the elected

district attorney of Gray County, Texas when petitioner pled guilty to aggravated assault of a

police officer on January 12, 1988 and when petitioner pled guilty to unauthorized use of a

motor vehicle on May 9, 1988.[13]  Petitioner contends that, because Comer was the district

---

[13] In his amended petition, petitioner also alleges Mr. Comer was involved in illegal activities when he was the District Attorney and was forced to resign as District Attorney because he pled guilty to a misdemeanor official misconduct charge. Petitioner alleges Comer had a "reputation" for abusing cocaine and had a large debt to the IRS when he was appointed to represent petitioner.  In an affidavit filed with the State's response, Mr. Comer categorically denies these allegations, states that these allegations were made by petitioner's former attorney, Steven Losch, in an effort to coerce Mr. Comer into signing an affidavit supporting petitioner's claim, and refers to a telephone call between the two men after the amended petitioner was filed in which Mr. Losch offered to retract the allegations in return for an affidavit from Mr. Comer. (Response, Ex. A).

Mr. Losch has since died and been replaced as petitioner's federal habeas counsel and, while petitioner has not retracted these claims, they were not developed at all at the evidentiary hearing held in this case.  Moreover, while petitioner argues in his reply that Mr. Comer's financial situation created an incentive for Mr. Comer not to inform petitioner about any potential conflict and/or would be a reason to question Mr. Comer's veracity, this Court finds that these allegations about Mr. Comer's character have not been shown to have evidentiary support and further, are not relevant to the issue of whether he had a conflict of interest because he was the District Attorney when petitioner was prosecuted in two previous cases.  Accordingly, these unsupported allegations will not be addressed by this Court.

attorney in these two prior cases, he would not have been able to attack the underlying facts of the two convictions at trial because the fact that he had previously prosecuted petitioner meant that he would have been representing competing interests. Petitioner also argues he did not waive this conflict of interest. Accordingly, petitioner alleges he is entitled to relief because his attorney had an actual conflict of interest which was not waived by petitioner.

In *Hernandez v. Johnson*, the Fifth Circuit assumed, without deciding, that a scenario where a defense attorney had been the district attorney was one properly analyzed under *Culyer*, even though it is not a situation where multiple defendants have been represented, but two parties with "arguably disparate interests." *Hernandez*, 108 F.3d at 559. This Court, following *Hernandez*, will also analyze this claim using the *Culyer* standard. In *Hernandez*, the Fifth Circuit determined that a capital murder defense attorney who had been the elected district attorney when Hernandez had been previously prosecuted for two other offenses did not have an actual conflict of interest because his involvement in the previous cases was not "personal and substantial" enough to give rise automatically to a conflict of interest. Specifically, although the attorney signed several motions and two applications for subpoenas in the previous two cases as district attorney and probably approved the plea bargains, he was not the trial counsel in either case. *Id*. at 559-60. Accordingly, the Fifth Circuit held that Hernandez' attorney did not actively represent conflicting interests. *Id.* at 560. Furthermore, the Fifth Circuit held that Hernandez had failed to prove that any alleged conflict affected the attorney's performance because Hernandez had failed to establish that there was any viable basis upon which the prior convictions, which were admitted into evidence at the punishment phase of the trial, could be attacked. *Id*.

Similarly, even if this Court were to determine that Mr. Comer represented conflicting

interests, petitioner has not shown Mr. Comer was acting under an actual conflict of interest because he has not shown, as required under *Mickens v. Taylor* and *Hernandez*, that any such conflict *affected* his performance.  At the trial, in addition to the substantial testimony at the punishment phase regarding various unadjudicated offenses committed by petitioner, testimony was also given regarding these two prior adjudicated offenses committed by petitioner.  First, a probation officer testified that after petitioner pled guilty to aggravated assault on January 12, 1988, for which he received a sentence of three years probated, that she supervised him for a period of about two months until he was arrested and sentenced to five years in prison for the unauthorized use of a motor vehicle charge. (R. 31:1724-28).  No testimony was given regarding who prosecuted petitioner.  Subsequently, the penitentiary packet from the second conviction (unauthorized use of a motor vehicle) was entered into evidence at punishment through the testimony of a fingerprint expert. (R. 32:1956).  This conviction was the one in which petitioner pled guilty to the offense of unauthorized use of a motor vehicle on May 9,1988 in exchange for a five year sentence and dismissal of a motion to revoke probation. (State's Ex. #184).[14]  The pen packet itself does state that Mr. Comer represented the State at the plea hearing, but does not elaborate further. The only other mention of either offense was by Mr. Comer in his closing argument, where he stated that the evidence reflected that petitioner had been to the penitentiary only one time, for the unauthorized use offense, served seven months, and was released on parole, which he successfully discharged. (R. 33:2363-64).[15]

---

[14]In an affidavit submitted with Respondent's response, Mr. Comer states that petitioner pled guilty to the aggravated assault of a police officer and received three years probation.  This probated sentence was then discharged as part of the plea agreement for the plea of guilty petitioner made on May 5, 1998 to the UUMV offense. (Response, Ex. A at 2).

[15]Mr. Comer made this statement as support for his argument that petitioner would not be a danger in prison if sentenced to a life sentence.

Petitioner has failed to show Mr. Comer was operating under an actual conflict of interest because this testimony and the pen packet were admitted into evidence.  Petitioner alleges that, had Comer not been operating under a conflict of interest, he could have attacked the factual basis for the convictions and thus presented evidence in mitigation of the convictions. Specifically, petitioner alleges he informed Comer that he was not actually guilty of the unauthorized use of a motor vehicle because he believed that the owner of the truck had given him permission to drive it, as he had given such permission in the past, and that he kicked the police officer, the act for which he was charged with aggravated assault, in self-defense. (Petition at 63, n. 31).   Petitioner, however, has not offered any evidence in support of this allegation, and the record before this Court does not reflect any realistic basis upon which either of these two convictions could be challenged.    Assuming, solely for purposes of argument, that petitioner is contending he is innocent of the offenses for which he pled guilty, the record before this Court does not support petitioner's claim that Mr. Comer could have successfully presented convincing mitigating evidence had he not been operating under a conflict.  In particular, defense counsel placed into evidence, for record purposes only, further documentation regarding the unauthorized use of a motor vehicle offense.  Included in this documentation is the offense report which reflects that, when the complainant contacted the Pampa police to report that his truck was stolen from his front yard, he also reported that petitioner had called him three hours earlier, told him that his truck was in Borger, Texas, and told him that a third party had stolen the vehicle and driven it there.  The report also indicates that petitioner had earlier been stopped by the Borger police while driving the truck, and was driving the same truck when he stole gas from a gas station. (Def. Ex. #15).  As former District Attorney Mann stated at the evidentiary hearing, had

defense counsel attempted to attack the factual validity of the convictions, he would have presented evidence in support of the convictions. (E.H. III:736-39).  This would have included the transcript from the plea hearing in which petitioner admitted taking the vehicle without authorization. (E.H. III:738).  Presumably, such evidence would have also been of the type contained in this offense report, which reflects that petitioner did not innocently borrow a car, but instead took a vehicle without permission and attempted to blame someone else for the theft. Likewise, as Mr. Comer explained in his testimony at the hearing, while petitioner had told him both that he did not recognize the person he kicked was a police officer and also claimed that he acted in self-defense, he would never have opted to challenge the factual basis for the aggravated assault conviction because it was unlikely the officer would testify that petitioner acted in self-defense.  Therefore, to present such evidence petitioner would have had to testify and open himself to cross-examination by the prosecution. (E.H. III:752-53).[16]

Further, while it is true that Mr. Comer testified, without objection, as to what petitioner told him regarding the aggravated assault conviction, Mr. Comer also testified the issue of attacking the priors was discussed with petitioner and it was agreed that they should not attack the prior convictions.  (E.H. III: 767).  Further, the facts of the aggravated assault conviction do not support petitioner's position that he did not know the person he kicked was a police officer. An offense report of the incident reflects police officers observed petitioner Skinner urinating in public, and that when the patrol vehicle stopped, petitioner fled.  The police caught him and arrested him for public intoxication.  While petitioner was being booked into jail and being

---

[16]Texas state case law has consistently stated that, once a criminal defendant decides to testify, he is to be treated as any other witness, and may therefore be cross-examined, contradicted, impeached, and discredited.  *Cisneros v. State*, 692 S.W.2d 78, 83 (Tex. Crim. App. 1985); *Brown v. State*, 617 S.W.2d 234, 236 (Tex. Crim. App. 1981); *Nichols v. State*, 494 S.W.2d 830, 834 (Tex. Crim. App. 1973).

placed into a detox cell, petitioner kicked Corporal Lance in the groin area.  (Resp. Ex. 33).

Thus, the record before this Court reflects that, even if Mr. Comer's prior position as District

Attorney did prevent him from attacking petitioner's prior two convictions, this was not an

actual conflict of interest as it did not affect his performance because petitioner has failed to

establish there was any viable basis upon which to attack these two prior convictions.

Accordingly, petitioner's fifth ground for relief is without merit, and it is recommended that it be

denied.[17]

       With respect to petitioner's sixth ground for relief, which petitioner phrases as being that

the trial court denied him effective assistance of counsel in the preparation of  a motion for new

trial by not allowing Mr. Comer to withdraw as counsel, in essence petitioner is complaining he

was denied effective assistance of counsel because Mr. Comer was unable, due to his conflict of

interest addressed above, to raise such conflict of interest claim in a motion for new trial.  The

undersigned has determined Mr. Comer was not operating under an actual conflict of interest at

trial.  Moreover, petitioner's conflict of interest claim has been fully developed at the federal

habeas level and has been addressed on its merits by this Court.  Accordingly, the underlying

claim petitioner alleges that he wished to have addressed in a motion for new trial has been

considered by this Court and found to be without merit.  Petitioner's sixth ground for relief is

without merit, and it is recommended that it be denied.

---

       [17]In their pleadings and at the evidentiary hearing, the parties have spent a substantial amount of time and effort
contesting the issue of whether petitioner waived any potential conflict of interest.  In particular, evidence has been presented
that the trial judge, the prosecutors, and defense counsel all have recollections, albeit of various strengths, of a conversation in
court between the trial judge and petitioner about Mr. Comer's potential conflict of interest, although this conversation was not
transcribed into the record.  Petitioner has disputed these recollections.  However, as this Court has determined that Comer was
not acting under an actual conflict of interest, there is no need to address the issue of whether any conflict was adequately
waived by petitioner.

D.
Work Product Claim

Ground 7

In his seventh ground for relief, petitioner argues his rights under the Sixth and

Fourteenth Amendments were violated because the trial court ordered defense counsel to

disclose an expert's work product to the State.  Specifically, petitioner contends the fact that the

trial court required defense counsel to disclose to the prosecution certain notes made by defense

toxicology expert, William Lowry, violated petitioner's right to due process because the

prosecution was given broader discovery than the defendant.  Petitioner also contends his Sixth

Amendment right to counsel was violated because the report ordered to be disclosed was work

product and was a communication between defense counsel and their agent about trial strategy.

Respondent counters that, besides being unexhausted, this claim is without merit because: 1) the

trial court did not violate Texas state law; 2) even if state law was violated, it does not rise to a

constitutional violation; and 3) even if there was a constitutional violation, it was harmless.

At trial, and over the defense's objection, the trial court required the defense to provide

notes made by the defense toxicology expert, Dr. William Lowry, so he could be cross-examined

regarding these notes. (R. 30:1441).  The trial court based this ruling on a state rule of evidence

that permits opposing counsel to view documents an expert has used as the basis of his opinion.

*See* TEX. R. CRIM. PROC. 705.  These particular notes contained written comments and questions

prepared by Dr. Lowry to serve as a format for the initial discussion with defense counsel so

counsel might provide him with additional information to use as a basis for his opinion. (R.

29:1421-22).

On direct appeal, the Court of Criminal Appeals held the ruling by the trial court violated

the state work product doctrine because Dr. Lowry was an agent of the defense, the written comments he made regarding the strengths and weaknesses of the defense's case were "highly privileged work product" of a nature intended to be protected by the work product doctrine, the defense did not waive this privilege when Dr. Lowry testified, and the document in question did not fall under the auspices of Rule 705. *Skinner*, 956 S.W.2d at 537-40.  Nevertheless, the Court of Criminal Appeals ruled the error was harmless beyond a reasonable doubt because: the matters contained in Dr. Lowry's notes were only a small part of the State's cross-examination of Dr. Lowry; the prosecutor's impeachment of Dr. Lowry's testimony was extensive and pointed to inconsistences between the evidence and the defense's theory that were not contained in Dr. Lowry's notes; there was no evidence contained within Dr.  Lowry's notes and not presented in the State's case that was emphasized by the State; and the defensive theory was not particularly plausible in light of the evidence, thus making most of the matters raised in Dr. Lowry's notes common sense deductions. *Id*. at 541-42.  On direct appeal, petitioner had also argued that requiring the defense to turn over these notes to the prosecution was a due process violation.  Having found error based on a violation of state evidence rules, the Court of Criminal Appeals overruled petitioner's due process claim, along with other claims he alleged based on these same facts. *Id*. at 542 .

*Citing Wardius v. Oregon*, 412 U.S. 470 (1973), petitioner asserts his due process right were violated.  In *Wardius*, the Supreme Court ruled that an Oregon statute that required a defendant to notify the prosecution if he intended to use an alibi defense along with the specifics of the defense and the names and addresses of the alibi witnesses violated the due process clause of the Fourteenth Amendment because it did not give reciprocal discovery rights to the defendant

requiring the State to reveal the names and addresses of witnesses it intended to call to refute the alibi. *Id*. at 472.  The Supreme Court noted it was fundamentally unfair to require a defendant to divulge the details of his own case while subjecting him to surprise concerning the State's refutation of the evidence he disclosed to the State. *Id*.  The Supreme Court reversed the conviction upon findings that there was a substantial possibility that the error may have infected the verdict. *Id*. at 479.

Assuming the holding in *Wardius* is applicable to the case at hand, petitioner is not entitled to relief on his due process claim.  First, he has pointed to no reciprocal State's evidence he was entitled to as a result of the tendering of Dr. Lowry's notes to the prosecution, but did not receive.  Second, and most importantly, he has failed to establish harm.  As the opinion in *Wardius* makes clear, harm must be established before an error leads to the reversal of a conviction.  At the federal habeas level, the appropriate harmless error test is the one set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Under this test, error is deemed harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 637.  District Attorney John Mann's cross-examination of Dr. Lowry was extensive, encompassing close to 100 pages of the trial record.  Prior to being provided the notes in question, District Attorney Mann questioned Dr. Lowry about several aspects of the case, including the fact that Dr. Lowry was aware that petitioner was interviewed by authorities on January 4, 1994, and in this interview petitioner stated that he left the house at around midnight with a cut hand and with an intent to have someone fix his hand, that he had told Twila not to go to Howard Mitchell's house, that he had been drinking all day long, that he had a habit of blacking out while drinking and not remembering what happened, and  that he realized when he

awakened later that night that his vodka bottle was gone. (R. 29:1398-1402).  All of these

particulars in petitioner's statements to the police on January 4th were mentioned by Dr. Lowry

in his notes. *Skinner*, 956 S.W.2d at 546-47.  As noted by the Court of Criminal Appeals, much

of what is contained in these notes is common sense and the inconsistencies between petitioner's

statements to the authorities and the defense's theory that petitioner would not have been

physically or mentally capable of committing murder had clearly occurred to the District

Attorney before he was provided these notes.  District Attorney Mann also questioned Lowry

extensively on potential weaknesses in the defensive theory that were not contained in the notes,

including petitioner's actions while at Andrea Reed's house, the fact that petitioner was mobile

at midnight and was able to walk the four blocks to Reed's house, the fact that petitioner asked

"is that all" when told he was being arrested on outstanding warrants, the presence of Twila

Busby's blood droplets on petitioner's shirt, and the absence of more of petitioner's bloody hand

prints in the house, given the level of his intoxication and the defense's theory that he would

have been in a stupor and would have had to hold himself upright. (R. 30:1467-77, 1482-83,

1499, 1509-10).  Accordingly, Dr. Lowry's notes were not the sole or even primary basis for the

State's cross-examination.

Rather, as was further noted by the Court of Criminal Appeals, the only piece of evidence

contained in Dr. Lowry's notes that was not placed into evidence elsewhere at trial was that

Twila Busby's blood alcohol level was .19.  Dr. Lowry was permitted to testify to this evidently

because the trial court erroneously believed such information was contained in the autopsy

report, which had already been admitted into evidence. (R. 30:1500-04).  But, the transcript of

petitioner's conversation with the police on January 4th, in which he stated two times that  he

thought Twila came home drunk that night, was already in evidence (State's Ex. #59A), as was

Howard Mitchell's testimony that he had spoken to Twila and petitioner by telephone at around

9:30 on December 31, 1993, they both wanted to come to his house for a drink, and he later

came and picked up Twila for the party, where people were drinking and dancing. (R. 26:575,

601), and as was Melvin Busby's testimony that at 8:00 that evening when he saw her, she

appeared to have been "drinking some" (R. 27:757).  Moreover, the defense had earlier placed

into evidence the testimony of Howard Mitchell's twelve-year-old daughter Sara who testified,

among other things, that Twila brought a vodka bottle over to her father's house on New Year's

Eve, she could smell vodka on Twila's breath, and Twila was "in-between" drunk, but not drunk.

(R. 29:1275-76).  Given that there was a substantial amount of this other evidence that Twila had

been drinking that day and night, Dr. Lowry's testimony regarding her actual blood alcohol level

did not add a substantial amount to the State's case against petitioner.  Thus, taken as a whole,

the cross-examination of Dr. Lowry based on his notes did not have a substantial and injurious

effect or influence in determining the jury's verdict.  Accordingly, any harm in the notes having

been provided to the prosecution was harmless.  The Texas Court of Criminal Appeal's decision

overruling petitioner's due process claim on direct appeal did not result in a decision that is

contrary to federal law.

Petitioner's Sixth Amendment claim under this ground is also without merit.  For the

reasons set forth above, any complaint that disclosure of Dr. Lowry's notes constituted an

invasion of petitioner's right to the effective assistance of counsel does not entitle petitioner to

relief because no prejudice resulted.  Petitioner has failed to show there was a reasonable

probability he would not have been convicted had these notes not been provided to the State.

Petitioner's seventh ground for relief is without merit, and it is recommended that it be denied.

E.
Right to Counsel Claims

Grounds 8 and 9

In his eighth ground for relief, petitioner asserts his right to counsel was violated when the Sheriff read and copied privileged correspondence between petitioner and his attorneys when petitioner was housed at the county jail awaiting trial.  In his ninth ground for relief, petitioner contends that the trial court violated his Sixth Amendment right to consult with counsel by ordering the bailiff to separate petitioner from his attorneys during recesses at trial.  Respondent responds that, in addition to these claims being procedurally barred, they are without merit because: 1) petitioner has failed to establish that any of his correspondence was given to the prosecution; and 2) the trial court's requirement that petitioner be removed from the courtroom during recesses at trial did not interfere with his right to consult with his trial counsel, which could occur in the holding cell.

1.  Privileged correspondence claim

On March 14, 1994, soon after he was indicted for capital murder, petitioner filed a *pro se* motion with the trial court requesting that the trial court enjoin the Gray County Sheriff's department from photocopying his "private/privileged" correspondence.  In this motion, petitioner alleged that the sheriff had opened correspondence from his attorney and from clergy. (Deposition ex. #4).  On April 27, 1994, after a pre-trial hearing held on April 25, 1994, state trial judge Kent Sims issued an order instructing the sheriff and his staff not to copy any of petitioner's mail and not to open privileged mail, that being mail from courts, federal officials,

attorneys, news media, and clergy, unless it was opened in petitioner's presence.  By the terms of

this order, the sheriff's office was permitted to open and inspect non-privileged mail for security

reasons, but was required to inform petitioner if any mail was confiscated.  (Deposition ex. #5,

Supplemental Statement of Facts, vol. 11).  Even though the state trial court entered this order,

there has been no documentation produced in this federal case showing any of petitioner's

privileged mail was in fact opened before the order was entered.

On May 18, 2004, by way of an order granting limited discovery, this Court authorized

petitioner to depose Randy Stubblefield, the elected sheriff of Gray County at the time of

petitioner's arrest and trial, and obtain all relevant documents from Mr. Stubblefield, in order to

develop the factual basis for petitioner's eighth ground for relief.  This deposition took place on

July 21, 2004, and petitioner submitted as exhibits to this court the transcript of the deposition,

as well as several other supporting documents.  In this deposition, Mr. Stubblefield testified that

it was the policy at the Gray County jail during his four years as sheriff to open and screen all

non-privileged mail that was sent to and from inmates for security reasons and to search for

possible contraband.  He further testified to his understanding that privileged mail was mail

inmates sent to and received from attorneys and clergy and that these could not be opened by jail

staff.  All mail sent from and received by inmates, however, would be noted in the jail mail log.

(Stubblefield deposition, pp.9-13, 15).  Mr. Stubblefield further acknowledged that, after

petitioner was arrested and charged with capital murder, he instituted a policy where the

envelopes of petitioner's <u>non-privileged</u> mail would be copied and forwarded to him, as

Stubblefield feared that petitioner would attempt to escape from jail, and he wanted a record of

who was sending and receiving mail from petitioner. (*Id*. at 59).  Stubblefield further testified

that, after he received the order from the trial court, they stopped copying petitioner's envelopes, and he gave all of the copies he had accrued to petitioner's attorney, Harold Comer, but the jailers continued to open and screen petitioner's <u>non-privileged mail</u>. (*Id*. at 101-02, 108-11). Finally, Stubblefield testified he neither gave the prosecution an envelope  or the contents of any letter written by or received by petitioner, either privileged or not, nor did he ever inform the prosecution about the contents of petitioner's letters. (*Id*. at 140-41).  The memo that was issued by Deputy Chief Rob Goodin, at Stubblefield's request, regarding petitioner's mail states that all of petitioner's non-privileged mail was to be copied and the copies placed in Stubblefield's box. (*Id*., ex. #2).

Petitioner asserts he is entitled to relief on this claim because Sheriff Stubblefield copied privileged correspondence and that information from such privileged correspondence with his attorneys was used  by the "prosecution team during their investigation and trial of the case." (Amended petition at 93).  As further support for this claim, petitioner points to an affidavit submitted by a former jailer, Kathy Reed.  In this affidavit, Ms. Reed asserts that the sheriff violated the court's order by continuing to open and read petitioner's mail. (Pet. Ex. #17).

In *Taylor v. Sterrett*, 532 F.2d 462, 472-75 (1976), the Fifth Circuit observed that it was a violation of a prisoner's Sixth Amendment right to effective counsel and his right to access to the courts for jail authorities to open an inmate's outgoing correspondence with an identifiable attorney at all or to open his incoming correspondence from his attorney, if opened outside the presence of the inmate.[18]  Petitioner alleges Sheriff Stubblefield opened, read, and copied *all* of petitioner's correspondence, including his correspondence with his attorneys, and forwarded

---

[18]As support for this claim, petitioner cites to an Arizona Supreme Court opinion which, in essence, has the same holding. *See State v. Warner*, 722 P.2d 291 (Ariz. 1986).

privileged information to the prosecution.  Petitioner has not, however, produced any evidence to

support this allegation.  Instead, the evidence before the Court is that Mr. Stubblefield denied

under oath that any correspondence between petitioner and his attorneys was opened or copied

by jail personnel, the memorandum that was issued to jail personnel pursuant to Stubblefield's

request, was that only petitioner's "non-privileged mail" was to be copied, and the only evidence

petitioner has presented that this activity continued after the court order to cease issued is an

affidavit from former jailer Kathy Reed.  In her affidavit, however, Ms. Reed does not allege that

any privileged correspondence was opened and/or copied.  Accordingly, even if this Court

assumes the trial court's order was violated, a point on which the parties disagree, there is

absolutely no evidence petitioner's privileged correspondence was opened by jail personnel,

either in or outside of his presence.  Petitioner has not shown a violation of his Sixth Amendment

rights.  Petitioner's eighth ground for relief is without merit, and it is recommended that it be

denied.

2.  Consultation with counsel claim

      During the punishment phase of the trial, petitioner addressed the trial court directly and

complained that he was being removed from the courtroom immediately after every recess was

called.  Petitioner asserted this prevented him from communicating with his trial counsel

regarding the testimony that was being given.  The trial judge responded that it was the policy in

Tarrant County to remove criminal defendants from the courtroom and further responded that he

had allowed counsel to consult with petitioner whenever they had asked and that he would, in the

future, ask petitioner's trial counsel if they needed any further consultation with petitioner.

Petitioner further objected at trial that this proposed remedy would violate his Sixth Amendment

rights. (R. 31:1886-88).  Petitioner further alleges that he could not speak with his attorneys in the holding cell where he was taken during each recess. (Petition at 96).

The Supreme Court has recognized that a non-testifying criminal defendant has an absolute right under the Sixth Amendment to consult with his attorney during his trial. *Perry v. Leeke*, 488 U.S. 272, 281 (1989).  Subsequently, the Fifth Circuit has stated that, while it may not be a constitutional violation to deprive a criminal defendant of the right to consult with counsel during any recess, no matter how brief, this constitutional right to counsel "warrants the most zealous protection." *United States v. Johnson*, 267 f.3d 376, 379 (5th Cir. 2001), *citing Perry v. Leake*, 488 U.S. at 278-79, *United Way v. Conway*, 632 F.2d 641, 645 (5th Cir. 1980), *overruled by Crutchfield v. Wainwright*, 803 F.2d 1103 (11th Cir. 1986).

As support for his claim that his removal from the courtroom during recesses at his trial was a violation of his Sixth Amendment right to counsel, petitioner cites several cases.  Most of these cases address circumstances where a trial court has ordered a defense attorney not to consult with his client during recesses that occur during the defendant's testimony at trial.  While the Supreme Court has held that it is not a constitutional violation for a defendant to be prevented from consulting with his attorney during a fifteen minute recess between his direct and cross-examination, *Perry v. Leake*, 488 U.S. at 281, it is generally recognized in these cases that a trial court may not prevent even a testifying defendant from consulting with his attorney during longer recesses, such as overnight or lunch recesses. *See Geders v. United States*, 425 U.S. 80 (1976), *Jackson v. United States*, 420 A.2d 1202 (D.C. App. 1979).

However, contrary to these cases, petitioner has not shown that the trial court prevented him from consulting with his attorneys during recesses that occurred during his trial.  While

there is an unsworn statement in petitioner's petition that he could not speak to his attorneys when he was in his holding cell, Respondent has submitted an affidavit from petitioner's lead counsel, Harold Comer, which states that counsel could communicate with petitioner before and after court and during extended recesses in the holding cell. (Response, Ex. A, p. 3). Accordingly, the credible evidence before this Court is that, while the trial court did not permit petitioner to sit in the courtroom during trial recesses, counsel could meet with petitioner in the holding cell during "extended recesses."  The term "extended recesses" has not been defined to this Court, even though Mr. Comer was called as a witness by both parties at the evidentiary hearing.  But, based on the record before this Court, petitioner has failed to establish he was denied his right to consult with counsel for any appreciably significant period of time during trial such that any binding precedent would require granting relief.  Moreover, petitioner has pointed to no precedent holding that a trial court cannot dictate where any such consultation will occur. Rather, the relevant case law indicates that the trial court's actions in this regard passed constitutional muster.  Petitioner's ninth ground for relief is without merit, and it is recommended that it be denied.

## ORAL ARGUMENT

As evidenced by this lengthy recommendation, this federal habeas case is unique in that, other than petitioner's claim number 7, there has been no state court resolution of petitioner's other eight claims.  The federal court was required to hear these claims initially and without the benefit of state court findings.  Consequently, the AEDPA deferential standard is inapplicable. Since eight of these nine claims were considered without any prior state court adjudication, the undersigned considered whether holding oral argument prior to the issuance of these findings,

conclusions and recommendation would be of assistance to the Court and such was briefly mentioned at the end of the evidentiary hearing.  The post-hearing briefs filed by both petitioner and respondent have adequately addressed the issues to the extent oral argument would be of no additional assistance particularly in light of the fact that both parties will have an adequate opportunity to file objections to this recommendation.  Consequently, no oral argument is scheduled.

## <u>RECOMMENDATION</u>

For all of the reasons set forth above, it is the opinion and finding of the undersigned that petitioner, HENRY W. SKINNER, has failed to make a substantial showing of the denial of a federal constitutional right on any of his claims.  Petitioner is not entitled to federal habeas corpus relief and his petition for a writ of habeas corpus should be DENIED.

ENTERED this 29th day of September 2006.


CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

# * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation.  In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is eleven (11) days from the date of filing as indicated by the file mark on the first page of this recommendation.  Service is complete upon mailing, Fed. R. Civ. P. 5(b), <u>and</u> the parties are allowed a 3-day service by mail extension, Fed. R. Civ. P. 6(e).  Therefore, any objections must be <u>filed</u> **on or before the fourteenth (14th) day after this recommendation is filed**.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Courts for the Northern District of Texas.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).